**U.S. WEST COMMUNICATIONS, INC.,
a Colorado corporation, et al.,
Plaintiffs,**

v.

**Renz D. JENNINGS, as a member of
the Arizona Corporation Commission, et al., Defendants.**

Nos. CV 97–26–PHX–RGS–OMP, CV97–394–PHX–RGS–OMP, CV97–1723–PHX–RGS–OM, CV97–1856–PHX–RGS–OM, CV97–1927–PHX–RGS–OM, CV97–2025–PHX–RGS–OM, CV97–2324–PHX–RGS–OM, CV97–342–PHX–RGS–OMP, CV97–626–PHX–RGS–OMP and CV97–629–PHX–RGS–OMP.

United States District Court,
D. Arizona.

May 4, 1999.

Christopher C. Kempley, Maureen A. Scott, Janice M. Alward, Janet F. Wagner, for Arizona Corporation Commission, Phoenix, AZ.

Timothy Berg, C. Owen Paepke, Theresa Dwyer, Fennemore Craig, Phoenix, AZ, L. Norton Cutler, Jr., Thomas M. Dethlefs, Wendy M. Moser, Blair A. Rosenthal, U.S. West Law Department, Denver, CO, for U.S. West Communications, Inc.

Steven J. Duffy, Ridge & Isaacson, Phoenix, AZ, David P. Murray, Kevin M. Miller, A. Renee Callahan, Willkie Farr & Gallagher, Washington, DC, for Sprint Communications Co.

Thomas H. Campbell, W. Todd Coleman, Lewis & Roca, Phoenix, AZ, Darryl M. Bradford, Terri L. Mascherin, Andrew M. Spangler, Jr., David C. Layden, Jenner & Block, Chicago, IL, Thomas F. O'Neill III, Mark B. Ehrlich, [in-house counsel], Washington, DC, for MCI Telecommunications Corp.

Andrew D. Hurwitz, Joan S. Burke, Osborn Maledon, Phoenix, AZ, Michael D. Warden, Stephen F. Smith, Jacqueline G. Cooper, James C. Stansel, Carl D. Wasserman, Sidley & Austin, Washington, DC, Maria Arias Chapleau, Rebecca DeCook, AT & T Law Department, Denver, CO, for AT & T Communications of the Mountain States, Inc. and AT & T Wireless.

Lex J. Smith, Michael J. Patten, Brown & Bain, Phoenix, AZ, Edward A. Yorgitis, Jr., Douglas P. Lobel, Joseph A. Boyle, Kelley Drye & Warren, Washington, DC, for e-spire Communications, Inc. (formerly American Communications Services, Inc.)

Patricia Lee Refo, Jeffrey B. Guldner, Snell & Wilmer, Phoenix, AZ, for Brooks Fiber Communications of Tuscson, Inc.

Douglas G. Bonner, C. Joel Van Over, Morton J. Posner, Ky E. Kirby, Tamar E. Finn, Swidler & Berlin, Washington, DC, for WorldCom Technologies, Inc. and GST Tucson Lightwave, Inc.

Arthur G. Garcia, Theodore C. Hirt, Philip D. Bartz, Jose deJesus Rivera, Dennis G. Linder, Brian G. Kennedy, David T. Zaring, Civil Division, U.S. Dep't of Justice, Washington, DC, for Federal Communications Commission.

## OPINION

PANNER, District Judge.

These ten consolidated cases arise under the Telecommunications Act of 1996 ("the Act"), Pub.L. No. 104–104, 110 Stat. 56, 47 U.S.C. § 153, *et seq.* US West Communications, Inc. ("US West"), the incumbent local exchange carrier ("ILEC") in Arizona, is a party in each case. The Arizona Corporation Commission ("the ACC"), which regulates public utilities in Arizona, is a defendant in each case, as are the members of the ACC in their official capacities ("the Commissioners").

Various prospective competitive local exchange carriers ("CLECs") are parties to one or more cases. They include AT & T Communications of the Mountain States, Inc. ("AT & T"), AT & T Wireless Services, Inc. ("AT & T Wireless"), TCG Phoenix ("TCG") (whose interest in this litigation was assumed by AT & T following the latter's acquisition of TCG), GST Tucson Lightwave, Inc., GST Net(AZ), Inc., and GST Telecom, Inc. (collectively "GST"), MCI Telecommunications Corp. and MCIMetro Access Transmission Services, Inc. (collectively "MCI"), Sprint Communications Company, L.P. ("Sprint"), Brooks Fiber Communications of Tucson, Inc. ("Brooks Fiber"), e-spire Communications, Inc. ("E-spire") (formerly known as American Communications Services, Inc. ("ACSI")), and WorldCom Technologies, Inc. ("WorldCom") (which has assumed the interest in this litigation formerly held by MFS Communications Company, Inc. ("MFS")). In addition, the Federal Communications Commission ("FCC") has participated as *amicus curiae.*

### SCOPE AND STANDARD OF REVIEW

"[A]ny party aggrieved" by a decision of a state public utilities commission concerning an interconnection agreement "may bring an action in an appropriate Federal district court to determine whether the Agreement ... meets the requirements of the Act." 47 U.S.C. § 252(e)(6).

The scope of review is confined to the administrative record. With regard to the standard of review, this court does not sit as a surrogate public utilities commission to second-guess the decisions made by the state agency to which Congress has committed primary responsibility for implementing the Act in Arizona. Rather, this court's principal task is to determine whether the ACC properly in-

terpreted the Act and any implementing regulations, which is a question of federal law that is reviewed de novo. In all other respects, review will be under the arbitrary and capricious standard.

## EFFECT OF RECENT SUPREME COURT DECISION

■ After oral argument in these cases, the Supreme Court decided *AT & T Corp. v. Iowa Util. Bd.,* —— U.S. ——, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). The Supreme Court's interpretation of the Act, and of the implementing regulations, must be applied to all pending cases. *See Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 312–13, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). "A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." *Id.*

However, in addition to interpreting the Act, the Supreme Court reinstated some FCC regulations that the Eighth Circuit had first stayed and later vacated. Some parties have urged this court to apply those reinstated FCC regulations when reviewing the ACC decisions and interconnection Agreements at issue here. The court declines to do so. Those regulations were not in effect when these Agreements were negotiated by the parties and approved by the ACC. Consequently, the ACC could not have erred by failing to apply those regulations. *MCI Telecom., Corp. v. GTE Northwest, Inc.,* 41 F.Supp.2d 1157, 1161–65 (D.Or.1999); *US West Communications, Inc. v. AT & T Communications of the Pac. Northwest,* 46 F.Supp.2d 1068, 1069-75 (D.Or.1999).

Whether a party may petition the ACC to modify an Agreement on the ground that there has been a subsequent change of law, or whether the ACC should grant such a request, are questions that should be addressed first by the ACC rather than by this court.

## DISCUSSION

### 1. *2–Wire Loop Price*

■ By a 2–1 vote,[1] the ACC authorized U.S. West to charge $21.98 per month for an unbundled 2–wire loop. AT & T, E-spire, GST, and WorldCom challenge that decision as arbitrary, capricious, and contrary to law. They contend that the ACC should have adopted the loop price of $16.28 per month recommended by a three member arbitration panel.

The hearing transcripts reflect that the Commissioners approached their task seriously and made a good faith effort to resolve conflicting evidence and reach a decision that complied with the law while protecting the public interest.

The ACC's task was complicated by the total element long run incremental cost ("TELRIC") pricing methodology that the FCC has pressured state public utilities commissions to adopt. TELRIC employs a "scorched node analysis" which assumes that the existing U.S. West network is replaced by a mythical efficient telephone network that retains only the locations of the existing U.S. West wire centers. As one state public utility commission observed, "TELRIC methodology assumes an optimal network that will never exist and which will produce services the current network cannot provide...." *Re U.S. West Communications, Inc.,* Docket No. RPU–96–9, 1998 WL 265370 at *5 (Iowa Util.Bd. April 23, 1998).

Because TELRIC focuses on a mythical network instead of U.S. West's existing network, each party was free to offer its own vision of this mythical network, limited only by the party's audacity and its ability to procure an expert witness willing to endorse that party's vision. Judging from the transcript of the ACC hearings, a majority of the Commissioners became in-

1. The vote was 2–1 on each of the pricing decisions at issue in this case.

creasingly frustrated with this pricing methodology and skeptical about the validity of the self-serving forecasts and models offered by the parties and their hired experts. Nevertheless, the ACC was compelled to make a decision, which it did. Under the circumstances, those challenging the ACC's decision have a difficult task to convince a reviewing court that the ACC was arbitrary and capricious in selecting one vision of this mythical network over a competing vision or in rejecting both visions and making its own reasoned forecast.

## A. Cable Sheath Mileage

The existing U.S. West network in Arizona contains approximately 43,504 miles of cable. Some of that mileage overlaps because U.S. West periodically "reinforced" the system to increase capacity. The parties agree that a mythical efficient network would contain fewer miles of cable, since adequate capacity would be installed from the outset. The Hatfield Model version 2.2.2, sponsored by MCI and AT & T, estimated that an efficient network would require 12,296 miles of cable. The arbitrators recommended adoption of that figure, but the Commissioners concluded it was unreasonably low. During the ACC hearing, AT & T conceded that version 2.2.2 of the Hatfield Model was flawed and often underestimated cable mileage. A newer version of the Hatfield Model (version 3.1) produced an estimate of 26,092 miles of cable, very close to the 26,489 mile estimate generated by U.S. West's RLCAP model. A majority of the Commissioners then voted to adopt the 26,092 figure.

This decision was not arbitrary and capricious. The ACC was not required to adopt AT & T's mileage estimate, which everyone agreed was seriously flawed. The ACC also did not err by allegedly relying upon extra-record evidence. Although the arbitrators did not have the benefit of Version 3.1 of the Hatfield Model, the ACC was not reviewing the arbitrators' recommendation for abuse of discretion but was deciding the matter *de novo*. Nor can the CLECs seriously assert that the decision is unfair because they were deprived of the opportunity to impeach their own models, or to retract their own admissions regarding the flaws in Version 2.2.2 or the mileage estimates generated by version 3.1 of the Hatfield Model.

In addition, the ACC made its decision in January 1998, 14 months after the arbitrators had heard testimony. By then, the defects in Version 2.2.2 of the Hatfield Model were well known within the industry. While an administrative agency's decision must be based upon the record, that does not mean the agency is required to ignore its own expertise and knowledge. One reason for deferring to agency decisions is the presumption that the agency has special expertise and knowledge regarding the industry that it regulates, and will apply that expertise and knowledge in its decisionmaking process, as the ACC did here.

The ACC did not arbitrarily increase the cable mileage to achieve a predetermined loop price, as several CLECs have asserted. During the ACC hearing, AT & T predicted that using the 26,092 figure would increase the loop price by $11.50. US West insisted the increase would not exceed $4.00 and offered to limit the change to $4.00 or the actual amount, whichever was less. The ACC agreed to this proposal. There was nothing improper about that decision.

Nor was the ACC obliged to adopt the entire Hatfield Model Version 3.1, which allegedly includes other "corrections" that result in a net $1.33 *reduction* in the loop price notwithstanding the $11.50 increase that resulted from correcting the cable mileage estimate. The ACC understandably was skeptical about this claim, which it did not have an opportunity to adequately investigate. In any event, the ACC did not adopt Hatfield Model 3.1 or any other version of the Hatfield Model. Rather, it considered the results generated by that

model and by U.S. West's RLCAP model, along with AT & T's admission that Version 2.2.2 of the Hatfield Model understated the cable mileage, in the course of making an educated estimate of the number of cable miles required by an efficient network.

The ACC's written decision does contain one obvious flaw. The decision inexplicably cites network reinforcement as the justification for *increasing* the cable mileage to 26,092 miles from the 12,296 miles estimated by Version 2.2.2 of the Hatfield Model. In reality, network reinforcement is the justification for *decreasing* the cable mileage from the 43,504 miles in the existing U.S. West network.

After reviewing the relevant portions of the record, the court is satisfied that this was merely a drafting error. The arbitrators prepared a Recommended Opinion and Order ("ROO"), which was then modified to reflect the changes ordered by the ACC. When the ACC modified the section on cable mileage, it neglected to revise this one sentence. The reasons for the ACC's decision are clearly stated in the contemporaneous transcripts. It is pointless to remand the matter merely to correct an obvious drafting error.

## B. Sharing of Placement Costs

In setting the loop price, the ACC assumed that U.S. West would pay half the costs of placing cable for this mythical network, with the remainder to be paid by other utilities or land developers. In its briefs and again at oral argument, E-spire interpreted the ACC's decision as assuming that U.S. West would pay fully three-quarters of those costs (*i.e.*, third parties would pay one-half the costs one-half of the time). However, the agency's written decision clearly states otherwise.

The ACC's decision was not arbitrary and capricious. Although the CLECs speculate that U.S. West could share trenches with multiple utilities (*e.g.*, gas, electric, cable television), that assumes these other utilities are simultaneously

participating in this same intellectual exercise and replacing their established utility networks in urban areas. However, those networks are already in place, and placement sharing is likely to occur primarily in new subdivisions. The CLECs also speculate that perhaps they could share the cost of building this mythical network, but the ACC understandably declined to rely on such conjecture. If the CLECs were prepared to foot the cost of actually building a new network, then they wouldn't need to use U.S. West's existing network.

## C. Depreciation Schedule

The ACC's decision to adopt a 15–year depreciation schedule for copper wire was not arbitrary and capricious. Although there was evidence that copper wire has a physical lifespan of at least 20 years, the issue here is its economic life. There was evidence that copper wire will increasingly become obsolete as a result of technological advances and consumer demands for additional services. While not everyone agrees with that assessment, the ACC has considerable discretion in resolving these conflicting forecasts.

The ACC also did not err by departing from the 24–year depreciation schedule it had established during a prior rate proceeding. For a number of reasons, decisions made during utility rate proceedings do not always reflect actual costs, nor are they necessarily indicative of what an efficient telephone company would do in a competitive market. Some of the same CLECs disputing U.S. West's proposed depreciation schedule admittedly utilize an even faster schedule for their own networks.

## D. Markup for Overhead and Common Costs

The ACC adopted a 15 percent markup, the same amount proposed by E-spire. E-spire contends that its proposal was actually intended for use with the U.S. West model, which differs from the Hatfield

Model, and the markup for the latter should be only 12.67 percent. However, the ACC was not obliged to adopt E-spire's entire proposal as a package. Some CLECs also cite a study that allegedly supports a lower number, but the ACC could reasonably have determined this study was inapposite or otherwise unpersuasive.

Finally, AT & T points to an incident in which Arbitrator Rudibaugh could not recall from memory precisely what costs were included in the markup. Since the Commissioners did not vote on this issue until a second meeting more than two months later, they had ample time to obtain the requested information during the interim. There is no basis to disturb the ACC's decision.

### E. Network Maintenance Costs

The issue here is the cost of maintaining the mythical efficient network. The Hatfield Model projected a reduction in maintenance costs (compared to the existing U.S. West network) in excess of 30 percent. The arbitrators decided that a 15 percent reduction was more realistic, and the ACC agreed. This decision was not arbitrary and capricious.

### F. Cost of Capital

During the prior rate proceeding, the cost of equity was fixed at 11.4 percent. US West proposed to use 12.85 percent in computing the loop price. The arbitrators agreed that 11.4 percent was too low, and recommended 11.9 percent. Instead, the ACC fixed the cost of equity at 12.4 percent.

Both sides rely almost entirely upon conclusory assertions, while pointing to little evidence of what rate of return U.S. West needs to attract sufficient new investment capital. Under the circumstances, this court cannot say that the ACC's decision was arbitrary and capricious. Ultimately, the agency had to choose a number. Faced with a dearth of credible evidence, the ACC drew upon its own experience and expertise, as it was entitled to do.

### G. Terminal Installation and Splicing Costs

Although a single pedestal can theoretically serve eight drops, the ACC concluded that an average of four drops per pedestal is more realistic in Arizona in view of the density of housing, topography, and other factors. That decision was not arbitrary and capricious.

The written order is somewhat contradictory, but the court is satisfied that any confusion results from a simple drafting error (the failure to revise certain language after the original recommendation was modified). Since the agency's intent and reasoning are clear, there is no need to remand for clarification.

### H. Three Pairs per Drop

The ACC concluded that a network designed and built today would have three pairs per drop instead of two. Given the high cost of adding additional pairs later, the ACC's decision was not arbitrary and capricious.

### I. Conclusion

TELRIC methodology requires the ACC to predict future events, often for a hypothetical telephone network. The ACC necessarily has considerable discretion in selecting these model inputs. Reasonable people might reach different conclusions regarding some inputs, as evidenced by the 2–1 split between the commissioners. Nevertheless, the agency's final decision on the two-wire loop price is not arbitrary and capricious or contrary to law, and is supported by substantial evidence in the record.

### 2. *Four–Wire Loop Price*

██ The ACC set the price for a two-wire loop at $21.98, and the price for a four-wire loop at $22.90. Since a four-wire

loop appears to be roughly equivalent to two two-wire loops, the court is unable to discern any rational basis for the ACC's decision. The ACC points to evidence that it will cost one or two dollars to add an additional pair of wires per *drop*, but a loop (which may run for several miles) is very different from a drop (which is just the last 50 feet or so of the loop). In addition, the price for a loop reflects not just the copper but also a pro rata share of the cost of digging the trench, overhead, and common costs.

AT & T vigorously defends the ACC's decision, but its own witness testified that the price for a "4–wire loop can be derived by taking the aggregated 2–wire loop price, multiplying it by two, and subtracting the cost of one NID." Rebuttal Testimony of Natalie Baker, p. 3.[2]

The ACC may have erred. At a minimum, it has failed to adequately explain its decision. This issue is remanded to the ACC for reconsideration.

### 3. *Non–Recurring Charges*

The ACC fixed the price for non-recurring charges ("NRCs") at the current retail tariff price less an 18 percent wholesale discount. US West and AT & T both object.

The "retail price less avoided costs" formula applies only when a CLEC purchases finished services for resale. *See* 47 U.S.C. § 252(d)(3). It is not clear from this record whether NRCs are properly classified as a "resale" product, particularly when those costs are incurred in connection with a CLEC's purchase of unbundled loops. A resale service is a telecommunications service that U.S. West ordinarily provides at retail to subscribers who are not telecommunications carriers. 47 U.S.C. § 251(c)(4)(A). The term "network element" is defined in 47 U.S.C. § 153(29). If NRCs are an unbundled network element, rather than a resale service, then the ACC must price NRCs on the basis of

forward-looking costs without regard to the retail price. 47 U.S.C. § 252(d)(1). Rather than speculate whether NRCs should be categorized as an unbundled element or a resale service, the court remands this issue to the ACC for reconsideration and to articulate a more detailed explanation for the agency's decision.

### 4. *Customer Transfer Charge*

The ACC limited the customer transfer charge to five dollars, reasoning that this is the maximum fee that can be charged when a customer changes long distance carriers. However, the ACC made no finding that this charge accurately reflects the costs that U.S. West incurs. The long distance transfer charge may have been artificially capped at five dollar so customers would not be discouraged from switching carriers. Notably, AT & T did not argue that U.S. West actually spends only five dollars to transfer a customer. Instead, AT & T argued that it should not be responsible for paying the costs that U.S. West incurs because AT & T does not directly "cause" those expenditures. In addition, even if the five dollar charge accurately reflects the costs of changing long distance carriers, the ACC made no finding that the tasks U.S. West must perform to change long distance carriers are comparable to the tasks involved in switching local carriers.

AT & T also contends that a higher customer transfer charge (which reflects U.S. West's actual costs) would discourage switching between carriers. Perhaps so, but U.S. West is still entitled to be compensated for its actual costs, whether through a customer transfer charge or otherwise. The court does not preclude the possibility that some form of bill-and-keep arrangement might be permissible, if customer transfers will roughly balance and the CLECs will bear the cost of implementing transfers of customers returning to U.S. West. However, the ACC did not

**2.** The court commends Sprint's attorneys for their candid concession that the ACC erred.

make the findings necessary to support such a plan.

Some of the CLECs argue that instead of a cost-based charge, the customer transfer charge should be viewed as a retail service that must be made available for resale, and priced accordingly. That assumes the customer transfer charge is a "telecommunications service" and further assumes it is a service U.S. West provides at retail and that there is an existing retail price from which to compute a wholesale price. The ACC did not address this argument in its decision, but should on remand.

This issue is remanded to the ACC for reconsideration and for such further proceedings as the agency deems appropriate.

### 5. *Deaveraging Loop Prices*

■ The CLECs contend that the ACC erred by establishing a single state-wide loop price, instead of "deaveraging" loop prices into multiple zones (based on density or some other criteria) and charging a different price for each zone. Deaveraging would reduce loop prices in dense urban areas, but significantly increase loop prices in the rest of Arizona.

The ACC concluded that the existing record was inadequate to properly implement deaveraging, and had doubts about the accuracy of the numbers it was being asked to approve. The ACC also was worried about the impact of deaveraging loop prices while retail prices remain fixed and before explicit universal service subsidies are operational. These are legitimate concerns. *Cf. AT&T Communications of Pac. Northwest, Inc. v. U.S. West Communications, Inc.*, 31 F.Supp.2d 861, 864–65 (D.Or.1998) (affirming Oregon PUC's decision not to order immediate deaveraging); *MCI v. GTE*, 41 F.Supp.2d at 1170–71 (same).

The ACC did not categorically reject deaveraging. Instead, it agreed to commence a separate proceeding to consider whether and how to deaverage loop prices,

and potentially to deaverage retail prices as well. That was a reasonable decision.

Network element prices must be based upon the cost of providing the element. 47 U.S.C. § 252(d)(1)(A). The ACC's decision does not violate that requirement. *See, e.g., MCI Telecom, Corp. v. U.S. West Communications, Inc.*, Case No. C97–1508R, slip. op., (W.D.Wash. July 21, 1998) at 33–34. Although the CLECs would prefer that the market be segmented further, the Act does not explicitly require this. The ACC acted within its discretion when it declined to order immediate deaveraging, and has provided ample justification for its decision.

Some CLECs argue that an FCC regulation, 47 C.F.R. 51.507(f), now mandates deaveraging into at least 3 zones. However, that regulation was not in effect when these Agreements were adopted and the loop prices were established. Whether the ACC must now revisit the deaveraging issue, as a result of the Supreme Court's decision reinstating the FCC's regulation, is a question properly addressed in the first instance by the ACC rather than by this court.

### 6. *Resale Discounts*

■ The discount rate reflects the net costs (*e.g.*, advertising, billing, and collection) that U.S. West could reasonably avoid by selling a particular service at wholesale rather than retail. 47 U.S.C. § 252(d)(3). Most of the CLECs contend the ACC set the discount rate too low.

There is no merit to the allegations by some CLECs that the Commissioners conducted an "auction" or otherwise acted improperly. Those transcript excerpts are taken entirely out of context, and simply reflect a little levity at the end of a long and sometimes contentious hearing. Although the CLECs contend the 18 percent discount rate is arbitrary and capricious, and prefer the arbitrators' proposal, during the hearing Arbitrator Rudibaugh advised the Commissioners that the 18 per-

cent figure was within the range supported by the record.

Several CLECs also challenge the rate structure adopted by the ACC. Potential cost savings may vary considerably between services. US West spends little to advertise basic residential service, but heavily promotes "vertical features" such as Caller–ID or call-waiting that provide generous profit margins. A single discount rate for all services, *i.e.*, a "unitary" discount, is unlikely to accurately reflect the avoided costs for each individual service. *See MCI v. GTE*, 41 F.Supp.2d at 1174.

An additional consideration is that a CLEC can often purchase a service at the resale discount, or else effectively obtain that same service by buying the unbundled network elements, whichever is cheaper. A discount rate that is generated by averaging a wide range of cost savings can be problematic if the CLEC can pick which services to order at the wholesale price and which to order at the unbundled element price. *Id.*

The arbitrators recommended that the ACC adopt a multi-prong discount, which ranged from a low of 10.05 percent for basic residential service up to a 63.17 percent discount for vertical features. Instead, the ACC adopted a 12 percent discount for basic residential service, while all other services are discounted by 18 percent. As a result, vertical features are discounted by only 18 percent, even though U.S. West proposed to discount this service by 44 percent and the arbitrators recommended a 63 percent discount. In other instances, the 18 percent discount is applied even though it is not clear that any significant cost savings will result. The ACC's decision does not explain or justify this decision. Rather, the text of the decision persuasively argues that a single discount rate is not appropriate.

The only other source of illumination is the hearing transcript, which indicates that the commissioners wanted to keep the discount rate structure simple. Simplicity is a desirable trait, but the ACC has not explained how multiple discounts would cause serious administrative difficulties. The ACC did express concern about the proper categorization of novel new services, but that seemingly can be addressed by means other than a unitary discount rate, *e.g.*, by setting an interim rate that applies to novel new services until the ACC fixes a permanent discount rate for that service.

The court is not suggesting that there must be a separate discount rate for each service U.S. West offers. However, the ACC must at least consider the range of cost savings for different categories of services, as well as the potential for abuse through selective ordering tactics, and determine whether additional discount rates are needed. Whether the ACC has, or can even obtain, the information needed to more accurately identify the cost savings attributable to various services will also be a factor in deciding whether to establish additional discount rates.

Because the decision does not adequately explain the result reached, or demonstrate that the ACC considered all relevant factors, the issue of resale discounts is remanded for further consideration. The court expresses no opinion regarding the proper result on remand.

### 7. *Access to Unbundled Subloops via the BFR Process*

The CLECs sought immediate unbundling of all subloops. US West opposed that request on grounds it would compromise network reliability, be technically infeasible in some locations, and require U.S. West to modify all 7600 feeder distribution interface ("FDI") boxes without any guarantee that the CLECs will ever order subloops at most of those locations.

The ACC decided to permit unbundling of subloops, but only through an expedited bona fide request ("BFR") process. Upon receiving a request to unbundle a particu-

lar subloop or group of subloops, U.S. West has 10 days to furnish a preliminary feasibility analysis and 21 days to furnish a price list. Any dispute will be resolved pursuant to the dispute resolution process established by the Agreement.

The FCC declined to order unbundling of subloops as a matter of course, because of lingering concerns regarding certain technical issues. *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996. First Report and Order*, CC Docket No. 96–98, 11 FCCRcd 15499 (Aug. 8, 1996) ("First Report and Order"), ¶ 391. Instead, the FCC left the decision up to each state public utility commission, which is more likely to be familiar with local conditions and better situated to address this issue. *Id.*

MCI's contention that the ACC is prohibited from considering technical feasibility is premised upon a misreading of *Iowa Util. Bd., v. FCC*, 120 F.3d 753 (8th Cir. 1997), *rev'd in part by AT & T*, —— U.S. ——, 119 S.Ct. 721, 142 L.Ed.2d 835. Nor is technical feasibility the only relevant consideration, as some CLEC's have argued. Rather, Congress listed certain factors that "at a minimum" must be considered when deciding what network elements must be unbundled, but did not prohibit consideration of other factors. 47 U.S.C. § 251(d)(2); *AT & T*, 119 S.Ct. at 734–36 (rejecting the FCC'S interpretation of § 251(d)(2)). There also is no merit to MCI's contention that service outages resulting from subloop unbundling are merely a "cost issue." Opening Brief at 19. By definition, service outages implicate "network reliability."

Next, MCI argues that the expedited BFR process is discriminatory because it provides U.S. West with speedier access to unbundled subloops. It is unlikely that U.S. West would ever seek to unbundle a subloop for its own customers. Such a request is unique to the CLECs. Consequently, there is no basis to make the comparison that MCI seeks to draw.

Nevertheless, the court questions whether it is really necessary to utilize the full BFR process, with its inherent delays, each time MCI orders an unbundled loop. Through advance planning and cooperation, the parties seemingly could expedite subloop unbundling in many instances while still addressing U.S. West's legitimate concerns. It also is unclear what percentage of subloop unbundling requests actually pose significant technical concerns. If the number is comparatively small, then it may be more efficient to simply establish a process for U.S. West to object to specific requests.

MCI has also proposed to pay U.S. West employees to perform subloop unbundling tasks, which may alleviate concerns that U.S. West's equipment could be damaged if CLEC employees are given access to the FDI boxes. At oral argument, U.S. West asserted that this violates the Eighth Circuit's decision in *Iowa Utilities* because it requires U.S. West to connect the cables on behalf of the CLECs. The court disagrees. The CLECs are willing and able to perform those tasks themselves, but have given U.S. West the option of using its own employees to perform the work if U.S. West prefers to retain exclusive control over access to the FDI boxes.

This issue is remanded to the ACC to consider whether U.S. West's legitimate concerns can be addressed by a less cumbersome procedure than is required by the present Agreement.

### 8. *Reciprocal Access to Poles and Ducts*

■ The ACC did not exceed its authority by ordering reciprocal access to all telephone poles, ducts, conduits, and rights-of-way not utilized exclusively for interstate telephone service. The court agrees with Judge Jelderks' analysis of the relevant statutes and the jurisdictional issue. *See U.S. West Communications, Inc. v. AT & T Communications of the Pac. Northwest, Inc.*, 31 F.Supp.2d 839, 849–51 (D.Or.1998), *supplemented,* 46 F.Supp.2d at

1077-80 (D.Or.1999). The interpretation urged by the FCC and the CLECs is contrary to the plain language of the Act.

Although the Act requires CLECs to grant reciprocal access, the FCC and ACC may still have the authority to protect a CLEC against an especially burdensome request for reciprocal access. Consequently, many of the CLECs' concerns regarding the reciprocal access requirement may prove to be unwarranted.

### 9. Fees to Reserve Space on U.S. West Poles

 The ACC did not exceed its authority by allowing U.S. West to charge a fee, equal to U.S. West's approved cost of capital, to reserve space on or in U.S. West poles, ducts, conduits, and rights-of-way. The reserving CLEC obtains an option for a fraction of the cost of actually leasing the space. Even if U.S. West or another CLEC give notice of intent to actually use the space, the first CLEC still has a right of first refusal. The ACC reasonably concluded this is a valuable right for which compensation should be paid.

A reservation fee also tends to discourage CLECs from reserving more space than necessary, and to minimize the likelihood of disputes concerning the sincerity of a CLEC's space reservations. This benefits both U.S. West and other CLECs. Without a reservation fee, MCI could reserve large portions of U.S. West's network, to the detriment of other CLECs who may also want to reserve space. That may explain why MCI is the only CLEC contesting this reservation fee.

MCI next contends that the fee is discriminatory because U.S. West does not pay a fee to reserve space on its own telephone poles. MCI ignores the fact that U.S. West built and paid for those poles, which is why the ACC used U.S. West's approved cost of capital to fix the amount of the reservation fee. For the same reason, there is no merit to MCI's

contention that the reservation fee does not reflect U.S. West's actual costs. Moreover, MCI's interpretation of 47 U.S.C. § 224(d)(1) imports the same temporal prerequisite (i.e., present usage or occupancy) that MCI has vigorously opposed in the context of dark fiber.

Finally, by requiring U.S. West to reserve space for use by its competitors, Congress arguably has interfered with U.S. West's control over its property. The reservation fee ensures that U.S. West will be compensated for this infringement.

### 10. Obligation to Exercise Eminent Domain

 The ACC ordered U.S. West to take various actions to accommodate CLEC requests for access to U.S. West's poles, ducts, conduits, and rights-of-way. US West objects to a requirement that U.S. West "exercise its eminent domain power when necessary to expand an existing [right-of-way] over private property in order to accommodate a request from [a CLEC] for access to such [right-of-way]." US West asserts that under Arizona law every utility has eminent domain power, so U.S. West should not have to perform that task on behalf of the CLECs. The court will assume, without deciding, that U.S. West has correctly stated Arizona law in this regard. No party has argued otherwise.

AT & T argues that the Act "clearly requires U.S. West to exercise its eminent domain rights and expand its rights of ways for new entrants...." That overstates the law.

In general, the Act does not require an ILEC to perform tasks on behalf of a CLEC that the latter is equally capable of completing itself. Congress gave the CLECs access to the existing U.S. West network only because it would be inordinately expensive and time-consuming to replicate that network. Similarly, Congress permitted the CLECs to interconnect with the U.S. West network only

because interconnection is an essential prerequisite to competition. Such concerns are not present here. If the CLECs are equally capable of exercising eminent domain power on their own behalf, there is no apparent reason why U.S. West should routinely perform that task for them. *Cf. AT & T*, 119 S.Ct. at 734–36 (FCC erred by requiring ILECs to unbundle network elements without regard to whether a CLEC can obtain those elements from other sources). AT & T has not explained how it would be unfairly prejudiced by exercising its own eminent domain powers.

AT & T's argument essentially boils down to a naked assertion that anything a CLEC wants, U.S. West must provide. That is not the law. *Id.* U.S. West is AT & T's competitor, not its butler.

The FCC's First Report and Order does not compel a different result. The language cited by AT & T is precatory: "We *believe* a utility *should* be *expected* to exercise its eminent domain authority …" First Report and Order, ¶ 1181 (emphasis added). The FCC knows how to enact binding regulations when it wants to. The FCC adopted numerous substantive regulations at the same time it issued this Report, but conspicuously chose not to issue a substantive regulation covering this topic. While the FCC sometimes acts through orders as well as formal rulemaking, the court declines to treat the entire 700–page First Report and Order (and its 3,277 footnotes) as one enormous substantive rule with the force of law. *See U.S. West v. AT & T, supra*, 46 F.Supp.2d at 1077-80.[3]

47 U.S.C. § 224(h) is the only statutory authority cited by the FCC. That section offers no support for the proposition that an ILEC must *routinely* exercise eminent domain powers on behalf of a CLEC notwithstanding that the CLEC is equally capable of accomplishing the same task. The First Report and Order also gives no indication that the FCC even contemplated that state law might authorize a CLEC to exercise eminent domain powers in its own right.

The ACC assumed it was compelled to follow the FCC's interpretation of the Act and therefore never exercised its independent judgment. This issue implicates important questions of Arizona law and policy with regard to public utilities. In addition, the ACC's superior knowledge of local conditions qualifies it to identify the range of circumstances in which the CLECs genuinely need U.S. West's assistance to acquire rights-of-way or the public interest would otherwise be served by such an arrangement.

Therefore, the court remands this issue to the ACC for reconsideration. The ACC may require that U.S. West exercise eminent domain powers on behalf of the CLECs, but the agency must better define those circumstances and explain why this action is necessary to further competition or is otherwise in the public interest.

### 11. *Access to Dark Fiber*

The ACC conditionally approved the CLECs' request for access to U.S. West's dark fiber. US West challenges the ACC's authority to grant the request, while AT & T and MCI challenge three of the conditions. The court denies the requests, by some parties, to stay portions of this claim pending the FCC's issuance of a replacement for Rule 319, which was vacated by the Supreme Court.

#### A. Authority to Unbundle Dark Fiber

 Dark fiber is a network element and the ACC has the authority to order U.S. West to unbundle it. *See U.S. West v. AT & T*, 31 F.Supp.2d at 854, *supple-*

---

**3.** The CLECs correctly note that, in the context of a motion to dismiss early in the case, this court did treat the entire First Report as binding. However, as this case has progress-ed the court has become more familiar with the issues, the structure of the Act, and the First Report itself, and the court's views have evolved accordingly.

*mented,* 46 F.Supp.2d at 1081. The Supreme Court's decision in *AT & T* does not compel a different result. The ACC not only considered whether AT & T and MCI have comparable alternatives to using U.S. West's dark fiber, but also made such a showing a prerequisite to ordering dark fiber.

**B. Needs Test**

AT & T and MCI challenge a requirement that when requesting dark fiber from U.S. West, they "must establish that another Network Element of comparable expense cannot satisfy [their] needs." This is a reasonable condition. Fiber is a valuable commodity which can transport a very large volume of traffic. The condition helps to ensure this resource is not wasted. It also is consistent with an underlying theme of the Act, which is to provide the CLECs with access to resources that are necessary for local competition but cannot readily be duplicated. If a comparable alternative is readily available, then the CLECs do not need access to U.S. West's dark fiber. *See AT & T,* 119 S.Ct. at 734–36. Finally, this requirement does not violate 47 U.S.C. 251(d)(2).

AT & T and MCI complain that the condition is discriminatory because U.S. West has access to its own dark fiber without having to demonstrate need. That argument ignores market realities. US West has little reason to waste its own valuable fiber if the same need could be met by another network element of comparable expense. AT & T and MCI also ignore the fact that U.S. West owns this dark fiber, which by definition confers certain privileges and advantages.

**C. Right to Reclaim Dark Fiber**

 AT & T and MCI object to a condition that allows U.S. West to reclaim its fiber, with twelve months notice, "if U.S. West can establish that the fiber is necessary to meet its bandwidth requirements or those of another requesting CLEC, provided that the original CLEC's transportation is provided for by alternative means and at comparable prices and quality. The conversion to the alternative means shall be at the expense of the new user of the Dark Fiber, whether that be U.S. West or another CLEC. One of the alternative means to be considered by U.S. West will be the sharing of bandwidth."

In other words, before U.S. West can reclaim its fiber from AT & T or MCI, either for its own use or on behalf of another CLEC, U.S. West must (1) give a year's notice, (2) establish that it or another carrier actually needs the fiber, (3) establish that AT & T/MCI have alternatives at comparable price and quality, and (4) compensate AT & T/MCI for the cost of conversion. This is a reasonable condition that helps to ensure that fiber will be efficiently managed while protecting the interests of all concerned.

AT & T and MCI contend that this condition is discriminatory because U.S. West is not subject to having its own rights revoked. This is tantamount to an uninvited house-guest alleging discrimination because he can be asked to leave, on twelve month's notice, if the homeowner proves that she needs the space for her own family and pays to relocate the house-guest to comparable quarters. AT & T and MCI's other arguments do not merit discussion.

**D. Reciprocal Access to Dark Fiber**

 AT & T objects to the following condition:

> If AT & T obtains access to U.S. West's Dark Fiber, AT & T shall make its Dark Fiber available to U.S. West on a comparable and reciprocal basis. This Section . . . shall not take effect until CLECs (other than wireless CLECs) operating within U.S. West's Arizona service territory provide service to at least 200,000 access lines.

MCI challenges a similar condition in its Agreement. The court reluctantly sustains those objections.

The FCC has decreed as follows:

A state may not impose the obligations set forth in section 251(c) of the Act on a LEC that is not classified as an incumbent LEC as defined in section 251(h)(1) of the Act, unless the [FCC] issues an order declaring that such LECs or classes or categories of LECs should be treated as incumbent LECs.

47 C.F.R. § 51.223. The duty to unbundle network elements is an obligation contained in § 251(c), and neither AT & T nor MCI is presently classified as an incumbent LEC in Arizona.

In ¶ 1247 of the First Report and Order, the FCC explained its reasons for enacting § 51.223:

1247. We conclude that allowing states to impose on non-incumbent LECs obligations that the 1996 Act designates as "Additional Obligations on Incumbent Local Exchange Carriers," distinct from obligations on all LECs, would be inconsistent with the statute. Some parties assert that certain provisions of the 1996 Act, such as sections 252(e)(3) and 253(b), explicitly permit states to impose additional obligations. Such additional obligations, however, must be consistent with the language and purposes of the 1996 Act.

The FCC's explanation is not very persuasive. Although Congress chose not to impose certain obligations on every CLEC every time, it is a logical leap to infer that those obligations therefore can never be appropriate in any instance. Moreover, Congress carefully included savings clauses allowing states to impose additional requirements so long as they do not conflict with the Act. *See, e.g.,* 47 U.S.C. §§ 252(e)(3), 253(b), 261(c). The effect of the FCC's regulation is to turn the minimum requirements of the Act into a ceiling rather than a floor. That would appear to be at odds with the Congressional mandate.

Although this court questions the FCC's interpretation of the Act, the court also must follow that interpretation. The FCC did more than simply discuss its interpretation in the commentary of the First Report. The FCC incorporated that interpretation in a formal regulation. Thus, there can be no doubt that the FCC has issued a substantive rule governing this topic, and the state commissions had notice of that action. That distinguishes this situation from certain others (such as access to poles and ducts) where the FCC simply expounded upon its view in the course of a 700–page Report, but did not incorporate that discussion in any of the "final rules" it ultimately adopted. Under the Hobbs Act, 28 U.S.C. § 2342, the FCC's regulation may be challenged only in the Court of Appeals.

In ¶ 1248 of the First Report, the FCC did hold out a slim reed of hope by suggesting that state commissions may seek permission from the FCC to treat a CLEC as an ILEC pursuant to 47 U.S.C. § 251(h). However, § 251(h) applies only when a CLEC has "substantially replaced an incumbent local exchange carrier." § 251(h)(2)(B). It seems unlikely that any one carrier will ever attain such dominant status. Rather, as in the long distance market, there may be several major carriers along with numerous smaller carriers. Thus, this reed may prove illusory.

The ACC must revise the AT & T and MCI Agreements to eliminate the condition requiring reciprocal access to dark fiber.

**12.** *Single Point of Interconnection*

■ When a U.S. West customer in Arizona calls an AT & T or MCI customer, or vice versa, the networks must interact. AT & T and MCI want a single point of interconnection. Regardless of where in Arizona the call originates or is bound, it

first must be transported to this point of interconnection, which may be many miles away. Even a call to the next-door-neighbor may need to be transported across town or even across the state.

US West contends this is a very inefficient means to exchange traffic between local networks, and will overload U.S. West's tandem switches and other facilities, forcing U.S. West to expand capacity at considerable expense. It is not as serious a problem for AT & T and MCI because their network architectures do not utilize tandem switches.

Neither the Act nor FCC regulations specify how many points of interconnection a carrier must have. *US West v. AT & T*, 31 F.Supp.2d at 852. The language in 47 U.S.C. § 251(c)(2) authorizing interconnection "at any technically feasible point within the carrier's network" answers only the question of whether a CLEC may interconnect at a given point, not how many points of interconnection a CLEC must (or may) have. *Id.* If the word "any" in § 251(c)(2) meant "one," as MCI and AT & T contend, then a CLEC could not establish more than one point of interconnection with U.S. West's network, which could lead to absurd results.

The court also rejects U.S. West's contention that a CLEC is always required to establish a point of interconnection in each local exchange in which it intends to provide service. That could impose a substantial burden upon the CLECs, particularly if they employ a different network architecture than U.S. West.

Whether to require more than one point of interconnection is best determined by each state's public utilities commission, which is most knowledgeable about the details of the parties' respective system architecture and local circumstances, subject of course to the standards established by the Act and any applicable FCC regulations.

In the MFS (now WorldCom) decision, the ACC assumed that it had authority to require more than one point of interconnection, and indicated that it would require additional points of interconnection if the circumstances warranted. In the AT & T and MCI decisions, the ACC reversed course and assumed that it lacked the authority to intercede. Unlike the MFS decision, the ACC made no mention of allowing U.S. West to seek relief if problems do arise or requiring additional interconnection points when circumstances warrant. *Cf. U.S. West v. AT & T*, 31 F.Supp.2d at 852–53.

In its briefs, the ACC states that, in making this decision, the agency considered only whether interconnection was physically possible at the requested location. The ACC ignored other factors such as the cost to U.S. West of establishing only a single point of interconnection, because the ACC assumed it could not consider those factors.

Although cost is not grounds to prohibit a CLEC from interconnecting at a particular technically feasible location it has chosen, that does not answer the question of how many points of interconnection there must be. There is a significant difference between saying that the CLEC must connect on a particular street corner or is prohibited from connecting there, versus requiring that it have a connection somewhere within a 30–mile radius of downtown Phoenix (as an example).

In determining whether a CLEC should establish more than one point of interconnection in Arizona, the ACC may properly consider relevant factors, including whether a CLEC is purposely structuring its point(s) of interconnection to maximize the cost to the ILEC or to otherwise gain an unfair competitive advantage. The purpose of the Act is to promote competition, not to favor one class of competitors at the expense of another.

As an alternative, the ACC may require a CLEC to compensate U.S. West for costs resulting from an inefficient interconnection. *See* 47 U.S.C. § 252(d)(1); First

Report and Order, ¶ 199; *Iowa Utilities*, 120 F.3d at 810. It would be ironic if a law designed to promote a market-driven economy in local telephone service were instead interpreted to prohibit the consideration of cost when making decisions and thereby subsidize and reward inefficient behavior by market participants.

This issue is remanded to the ACC for reconsideration and such further proceedings as the ACC deems appropriate.

### 13. *Tandem Switch Treatment*

 The ACC's decision to treat the TCG and Brooks switches, and the AT & T Wireless Service mobile switching center, as tandem switches was not arbitrary and capricious. The record also shows that the ACC did not treat the FCC rule as binding, but voluntarily chose to adopt the same standard anyway.

### 14. *Access to MCI's Long Distance Affiliate*

 MCI contends the ACC exceeded its jurisdiction by giving U.S. West access to MCI's long distance affiliate. MCI omits critical details. In an effort to obtain compensation at the tandem switch rate, MCI had represented to the ACC that it planned to cover a geographic area comparable to U.S. West's tandem switch by utilizing both MCI's own facilities and those of its long distance affiliate to terminate U.S. West calls. The ACC conditionally approved the tandem switch rate, subject to MCI's compliance with that voluntary representation. Otherwise, MCI will be compensated at the end office switch rate. The ACC's decision was not improper. On the contrary, it was MCI that first proposed this idea.

### 15. *Restrictions on Resale of CENTREX*

US West may sell certain products and services, such as CENTREX, only to the specific category of customers that the ACC designated when it approved the U.S. West tariff. The ACC incorporated similar restrictions in the interconnection agreements. CLECs may resell these products only to the same category of customers who would be eligible to purchase them from U.S. West in the first place. AT & T challenges that restriction and demands the right to resell these products to anyone, even though under Arizona law U.S. West is prohibited from doing the same.

47 U.S.C. § 251(c)(4) requires an ILEC to "offer for resale at wholesale rates any telecommunications service that the carrier provides at retail..." The ILEC may not "prohibit ... [or] impose unreasonable or discriminatory conditions or limitations on ... the resale of such telecommunications service...." However, "a State commission may, consistent with regulations prescribed by the [FCC] under this section, prohibit a reseller that obtains at wholesale rates a telecommunications service that is available at retail only to a category of subscribers from offering such service to a different category of subscribers."

The FCC has promulgated the following regulation:

(a)(1) Cross-class selling. A state commission may permit an incumbent LEC to prohibit ... [the resale of] services that the incumbent LEC makes available only to residential customers or to a limited class of residential customers ... to classes of customers that are not eligible to subscribe to such services from the incumbent LEC.

\* \* \* \* \* \*

(b) With respect to any restrictions on resale not permitted under paragraph (a), an incumbent LEC may impose a restriction only if it proves to the state commission that the restriction is reasonable and non-discriminatory.

47 C.F.R. § 51.613. In other words, the states may always impose cross-class restrictions on the resale of residential services. In addition, an ILEC may impose

other restrictions on resale if it demonstrates, to the satisfaction of the state public utilities commission, that "the restriction is reasonable and non-discriminatory."

Since U.S. West may offer CENTREX only to certain categories of customers, the ACC concluded that it is neither discriminatory nor unreasonable to impose the same restrictions upon AT & T when it resells U.S. West service. The court agrees.

AT & T contends that U.S. West must also prove that the underlying tariff, restricting the sale of CENTREX to certain categories of customers, is itself reasonable and nondiscriminatory. The court disagrees. Since every retail service must be made available for resale, AT & T's interpretation of the statute would effectively put the FCC and this court in the position of reviewing every existing state public utility commission tariff to decide what intrastate services may be sold and to whom. This would represent an extraordinary (and unnecessary) federal incursion into an area previously regulated by the states. The court has found nothing in the Act to suggest that Congress intended such a result.

A second flaw in AT & T's argument is that it places the burden upon the ILEC to justify all cross-class restrictions in the underlying tariff, even though it may have been the state public utilities commission—and not the ILEC—that insisted upon the restriction in the first place. An ILEC has little incentive to defend restrictions it never supported.

Finally, both § 251(c)(4) and 47 C.F.R. § 51.613 refer to conditions imposed by the ILEC, not conditions imposed by the state public utilities commission, and each specifically refers to conditions imposed upon resale and not to restrictions upon intrastate service in general.

For all these reasons, the court rejects AT & T's interpretation of the statute. The ACC may, consistent with Arizona law, modify its existing tariffs to remove restrictions on the sale of CENTREX that the ACC believes are no longer appropriate. However, the parties have cited no legal authority that permits either this court or the FCC to force the ACC to involuntarily implement the tariff modifications sought by AT & T.

The ACC's decision on this issue correctly interprets the Act and the ACC's duty, and is affirmed.

**16. Telephone Directories**

Several provisions require U.S. West to ensure that its affiliate, U.S. West DEX, takes certain actions concerning the contents of the white and yellow page directories that DEX publishes, the sale of display advertising, and the payment of commissions on the sale of advertising. US West contends that DEX is a separate company, and is not a telecommunications carrier, and therefore is outside the jurisdiction of the ACC and FCC. U.S. West also contends that the Act does not authorize the particular requirements at issue.

This claim presents a much closer question than the parties acknowledge. The requirements imposed here extend well beyond mere "directory listings." Resolution of this claim would require the court to venture into uncharted waters, and to determine the jurisdiction of both a federal and state agency, a task this court does not undertake lightly.

AT & T and MCI have now entered into contracts directly with U.S. West DEX. That development should moot the dispute, but the parties urge this court to reach the merits anyway. The court declines the invitation. If DEX someday breaches the contract, as the ACC suggests, the injured party can seek relief just as in any other contractual dispute. If DEX refuses to renew the contract on reasonable terms, as the ACC speculates, the parties can confront that problem when it occurs. Contrary to the suggestions made at oral argument, this case does not fall within either

the "voluntary cessation" or "capable of repetition but evading review" exceptions to the mootness doctrine.

### 17. Coin Phone Signaling

 The ACC did not exceed its authority by requiring U.S. West to provide coin phone signaling as an unbundled network element. Coin phone signaling is a feature of the local switch. Unless it is unbundled, U.S. West would be the sole local exchange carrier capable of providing lines for pay phones. US West's reliance on ¶ 147 of the FCC's Pay Telephone Order[4] is misplaced. There is a difference between the installation and operation of pay telephones and the retail pricing of pay telephone service, versus the provision of telephone lines used by pay telephone operators. Only the last issue is implicated here.

### 18. Providing Superior Service, Modifying Network

 Most of these claims have now been dismissed, either on grounds of ripeness or otherwise. Only two disputes remain. First, U.S. West objects to paragraph 12.2 in Attachment 4, which provides that:

> US WEST must provide installation to AT & T in the shorter of the time it provides installation to itself or any other Person. US WEST must provide installation to AT & T within ten (10) Business Days if it does not provide the same installation to itself or any other Person.

The MCI Agreement contains similar language. US West protests that it may not always be able to provide installation within this ten day limit. The court does not perceive this paragraph as requiring U.S. West to provide superior quality service. Rather, it establishes a default standard that applies when the requested installation is unique, hence there is no basis for

comparison with the level of service that U.S. West provides to other customers. Establishing minimum service standards falls squarely within the domain of the ACC, and the court declines to disturb the agency's determination of what is reasonable absent a far more compelling showing than has been made here.

The court does not read paragraph 12.2 as requiring U.S. West to perform the impossible. The parties each have very capable staffs. If, through no fault of U.S. West's, an unusually complex installation cannot reasonably be completed within ten days, the parties should be able to agree upon a more appropriate timetable. The contractual dispute resolution process is also available.

US West also objects to paragraph 16.1.1 in Attachment 4, which provides that:

> When requested by AT & T, U.S. WEST shall provide interconnection between U.S. WEST Network Elements provided to AT & T and AT & T's network at transmission rates designated by AT & T. If additional equipment beyond that which U.S. WEST currently has in place is planning to put in place or is otherwise required to have in place is required to meet such transmission rates, the installation and/or acquisition of such equipment shall be accomplished pursuant to the ordering process set forth in this Agreement.

Again, the MCI Agreement contains similar language. At oral argument, the parties were unsure whether this special equipment is necessary in order for AT & T and MCI to interconnect with the U.S. West network, e.g., their equipment requires that data be sent at a particular speed or using a special format, or whether this equipment is required merely because AT & T and MCI prefer faster transmission speeds or some other im-

---

**4.** Report and Order, *In the Matter of Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Tele-* *communications Act of 1996,* CC Docket No. 96–128, FCC 96–388 (rel. Sept. 20, 1996).

provement in the quality of U.S. West service.

Generally speaking, AT & T and MCI have the right to interconnect with the existing U.S. West network, not to some ideal network that they want U.S. West to build for their benefit. Nevertheless, U.S. West may be required to modify its existing network or operations "to the extent necessary to accommodate interconnection or access to network elements." *Iowa Utilities*, 120 F.3d at 813, n. 33. Interconnection agreements may also establish procedures and protocols for interfacing between the parties. Finally, if U.S. West upgrades its own network or would do so upon receiving a request from a customer, it may be required to make comparable improvements to the facilities that it provides to its competitors to ensure that they continue to receive at least the same quality of service that U.S. West provides to its own customers.

Since the intent of the challenged provision is not clear, the court remands this issue to the ACC for clarification. US West also asserts that the challenged provision is superseded by paragraph 1.3.1. The ACC can consider that argument on remand.

### 19. *Recombining Switches With Trunks to Provide Shared Transport*

The FCC has classified shared transport as a network element that must be unbundled. That determination was affirmed in *Southwestern Bell Tel. Co. v. FCC*, 153 F.3d 597, 604 (8th Cir.1998). Presumably, the FCC will revisit that decision now that the Supreme Court has rejected the standards used by the FCC to compile its list of network elements that must be unbundled. For now, however, U.S. West has given this court no reason to conclude that shared transport should not continue to be unbundled pending the FCC's rulemaking.

The court declines to consider U.S. West's objections to the pricing of shared transport, as that issue was not asserted below and this particular argument has never been addressed by the ACC. U.S. West argues that this issue arose only recently as a result of the Eighth Circuit's decision in *Southwestern Bell*. However, the ACC has expressed its willingness to revisit pricing issues if any party requests, once the ACC has had at least a year's experience with the current pricing structure. US West can present this issue to the ACC at the proper time.

### 20. *Sham Unbundling and Forced Recombination of Elements*

This court previously dismissed, with prejudice, U.S. West's claims that a CLEC is prohibited from purchasing unbundled elements and recombining them (itself) into a finished service, concluding that argument was foreclosed by the Eighth Circuit's decision in *Iowa Utilities*, 120 F.3d at 814–15. The Supreme Court's decision in AT & T does not require a different result.

US West's alternative claim, that it cannot be forced to recombine those elements for the CLECs, may have more merit. *See Id.* at 813 (vacating the FCC's recombination rule, 47 C.F.R. § 51.315(c)–(f)). However, the ACC has advised the court it is in the process of reconsidering its position on this issue. Therefore, the court dismisses this claim as unripe.

At oral argument, U.S. West expressed concern about the length of time that has elapsed since the ACC first began the reconsideration process, with little progress evident to date. The court shares those concerns. In view of the ACC's assurances that it is hard at work on this problem, the court will deny U.S. West's request for an immediate stay of the disputed contractual provisions involving forced recombination. *But cf.* 5 U.S.C. § 551(13) ("agency action" includes the "failure to act").

In its supplemental brief, U.S. West asserts that in the aftermath of the Supreme Court's decision "there is no valid unbundling rule or standard" and thus U.S. West

should not be required to "provide its assembled platform under the guise of unbundling." It is not entirely clear what U.S. West has in mind. If U.S. West is proposing to separate already-combined network elements, that is seemingly foreclosed by the Supreme Court's decision affirming 47 C.F.R. § 51.315(b). *AT & T,* 119 S.Ct. at 736–37. If U.S. West is proposing to withhold certain network elements, that would appear to violate the terms of the interconnection agreements.

US West must continue to honor its contractual commitments to supply network elements to the CLECs, in the manner prescribed in the contract, unless and until those obligations are expressly modified by a court or by the ACC. Neither contingency has occurred.

### 21. *Bill and Keep*

The ACC did not err by adopting bill-and-keep as an interim method of reciprocal compensation for calls between networks. The ACC gave U.S. West an opportunity to seek modification of that ruling at a later time if U.S. West can demonstrate that traffic is imbalanced.

The court declines to address compensation for calls made to internet service providers. That issue was not argued below. In addition, the FCC has indicated that modifications to existing interconnection agreements concerning this issue are left to the discretion of the state public utility commissions. *In the Matter of Inter–Carrier Compensation for ISP–Bound Traffic,* CC Dockets 96–98 and 99–68 (Feb. 26, 1999).

### 22. *Physical Collocation*

#### A. Collocation of RSUs

■ The Act provides for physical collocation of "equipment necessary for interconnection or access to unbundled network elements." 47 U.S.C. § 251(c)(6). In considering U.S. West's objection to collocation of Remote Switching Units ("RSUs"), the ACC assumed that "necessary" meant

only that the item was "used" or "useful." That lax definition is contrary to the ordinary meaning of the word "necessary," but consistent with the FCC's interpretation of the Act.

In light of *AT & T,* the FCC's interpretation of the word "necessary" in 47 U.S.C. § 251(c)(6) is no longer tenable. *See AT & T,* 119 S.Ct. at 734–36 (rejecting the FCC's application of the "necessary" and "impair" standards in Rules 317 and 319, and declaring that the FCC "has not interpreted the terms of the statute in a reasonable fashion"). Although the FCC's collocation rule, 47 C.F.R. § 51.323 ("Rule 323"), was not directly at issue in *AT & T,* similar defects are present in Rule 323(b). The FCC appears to have applied the same unacceptable definition of "necessary," and the same expansive view of the ILEC's obligations, in Rule 323(b) as it did in Rules 317 and 319. *See AT & T,* 119 S.Ct. at 736. In the aftermath of *AT & T,* it is clear the FCC will have to reconsider Rule 323(b) as well.

This issue is remanded for reconsideration in light of *AT & T.*

### B. Collocation Away from Central Offices

The ACC reasonably concluded that it would be unduly burdensome to use the BFR process for each request for collocation away from a U.S. West central office. If physical collocation is not technically feasible in a particular instance, then U.S. West may object to that specific request, which would trigger the dispute resolution provisions in the contract.

### 23. *Providing Vertical Features with the Switching Element*

■ The Eighth Circuit affirmed the FCC's contention that the Act allows a CLEC to obtain all vertical features of a switch when it purchases the unbundled switching element, even though the vertical features are allegedly finished services that U.S. West believes should be available

only via a resale discount. *Iowa Utilities,* 120 F.3d at 808–10. *See also AT & T,* 119 S.Ct. at 734 (vertical switching features "fall squarely within the statutory definition" of network elements). US West's claim therefore fails.

#### 24. *Most Favored Nation Clause*

E-spire contends that the PUC wrongly rejected a proposed "most favored nation" clause, also known as a "pick-and-choose" clause. The Eighth Circuit vacated the FCC's regulation mandating such a clause. *Iowa Utilities,* 120 F.3d at 800–01. At oral argument, this court expressed its intent to dismiss this claim. That no longer is appropriate, now that the Supreme Court has reversed the Eighth Circuit. *AT & T,* 119 S.Ct. at 738. The court will therefore address the merits.

■■■ The FCC's rule was not in effect when this Agreement was negotiated and approved by the ACC. Nevertheless, the Supreme Court concluded that this requirement is mandated by the plain language of the Act. *Id.* The ACC was, at all times, obligated to comply with the Act. Therefore, E-spire's position must prevail regardless of whether there was a binding FCC rule.

The particular language of that clause, and the details of its implementation, are matters to be determined by the ACC on remand.

#### 25. *Combining Local and Toll Traffic*

■■■ Some of the Agreements allow a CLEC to combine local and toll traffic on a single trunk group. US West complains there is no way to reliably determine which of the traffic that passes along a trunk is toll and which is local. Consequently, U.S. West will not be fully compensated for its share of the access charges associated with toll traffic.

In response to U.S. West's concerns, the ACC added a requirement for the CLEC to provide U.S. West with certain traffic reports. US West was also given the right to audit those reports if it has reason to doubt their accuracy. US West deems these measures inadequate. This court lacks the technical expertise to determine whose position is correct. For purposes of this proceeding, what matters is that U.S. West has not shown that the ACC's decision was arbitrary and capricious.

#### 26. *Other Claims*

Based upon the discussion at oral argument, it appears there are still proceedings before the ACC concerning the issues raised by Count V (recovery of construction and implementation costs) in Case No. 98–629. Therefore, that claim is dismissed, without prejudice, as unripe. For the same reason, the court also dismisses, without prejudice, Count XII of U.S. West's counterclaim (requirement to construct OSS interface) in Case No. 97–1856, Count IV (compensation for constructing OSS interface) of AT & T's complaint in Case No. 97–1927, and Count I (failure to include performance standards and non-compliance remedies) of MCI's complaint in Case No. 97–1856.

#### 26. *Motion to Strike*

Worldcom and MCI's motion to strike portions of U.S. West's reply brief is denied as moot.

### *CONCLUSION*

1. The following issues are REMANDED to the ACC for reconsideration in accordance with the above opinion:

A. Four-wire loop price;

B. Non-recurring charges;

C. Customer transfer charge;

D. Resale discounts (number of discount rates);

E. Unbundled subloops (BFR process);

F. Obligation to exercise eminent domain;

G. Single point of interconnection;

H. Paragraph 16.1.1 (special equipment);

I. Forced recombination of elements;

J. Collocation of RSUs; and

K. Most favored nation clause.

2. The ACC shall eliminate the requirement that AT & T and MCI provide reciprocal access to their dark fiber as a condition of using U.S. West's dark fiber.

3. The following claims are DISMISSED WITHOUT PREJUDICE as unripe:

A. US West's forced recombination claims;

B. Count V (recovery of construction and implementation costs) of U.S. West's complaint in Case No. 98–629;

C. Count XII of U.S. West's counterclaim (requirement to construct OSS interface) in Case No. 97–1856;

D. Count IV (compensation for constructing OSS interface) of AT & T's complaint in Case No. 97–1927; and

E. Count I (failure to include performance standards and noncompliance remedies) of MCI's complaint in Case No. 97–1856.

4. All other remaining claims are DISMISSED WITH PREJUDICE.

5. Worldcom and MCI's motion (docket # 331) to strike portions of U.S. West's reply brief, or in the alternative for leave to file a sur-reply brief, is denied as MOOT.