**MICHIGAN BELL TELEPHONE COMPANY d/b/a Ameritech Michigan, Plaintiff,**

v.

**MCI METRO ACCESS TRANSMISSION SERVICES, INC., and John G. Strand, Robert B. Nelson and David A. Svanda, Commissioners of the Michigan Public Service Commission (In Their Official Capacities and not as Individuals), Defendants.**

**No. 00–70636.**

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 22, 2001.

---

Michael G. Vartanian, John A. Dempsey, Dickinson, Wright, Lansing, MI, Michael A. Holmes, Ameritech, Detroit, MI; for Michigan Bell Telephone Company dba Ameritech Michigan, plaintiff.

Albert Ernst, Dykema Gossett, Lansing, MI, for MCIMetro Access Transmission Services, Incorporated, defendant.

David A. Voges, David M. Gadaleto, Michigan Department of Attorney General, Public Service Division, Lansing, MI, for John G. Strand, Robert B. Nelson, defendants.

### ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

ROBERTS, District Judge.

#### I. *Introduction*

This action arises out of an alleged violation of the Telecommunications Act of 1996, 47 U.S.C. § 251 *et. seq.* (the "Act"). The Act was designed to open local telephone markets, which had previously been controlled by monopolies, to full, fair and effective competition on a nationwide basis. In construing the Act, the Supreme Court held in *AT & T Corp. v. Iowa Utilities Bd.,* 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), that:

> States may no longer enforce laws that impede competition, and incumbent LECs [local exchange carriers] are subject to a host of duties intended to facilitate market entry. Foremost among these duties is the LEC's obligation under 47 U.S.C. § 251(c) (1994 ed., Supp. II) to share its network with competitors.

Plaintiff in this case, Michigan Bell Telephone Company d/b/a Ameritech Michigan ("Ameritech") is an incumbent LEC

("ILEC") under the Act and is obligated to allow would be competitors such as Defendant MCImetro Access Transmission Services, Inc., ("MCI") to gain access to its networks, facilities and services so that MCI can provide competitive services. In particular, § 251 of the Act requires an ILEC to allow competing LECs ("CLECs") to purchase for resale "any telecommunications service that the carrier provides at retail to subscribers." Section 251(c)(4).

ILECs meet their § 251 obligations by means of interconnection agreements, negotiated and/or arbitrated pursuant to § 252 of the Act. Section 252(a) provides that interconnection agreements are "binding." Section 252(a). The substantive rules governing interconnection are set by federal law, while Congress entrusted the process of establishing and enforcing interconnection agreements to State commissions. Section 252.

Under the mandate of the Act then, Ameritech negotiated an Interconnection Agreement ("Agreement") with MCI. The Agreement was filed, as required, with the Defendant, Michigan Public Service Commission (the "MPSC"), and approved by the MPSC on July 31, 1997. When a dispute arose as to the enforceability of the provision of the Agreement which required MCI to electronically place orders relating to resale services, MCI filed a challenge with the MPSC.

The MPSC, through its members, Defendants John G. Strand, Robert B. Nelson and David Svanda, entered an Order on January 3, 2000, allowing MCI to fax certain change orders concerning resale service orders, rather than requiring MCI to submit the change orders electronically as required by the Agreement. Although the MPSC recognized the clear language of the Agreement, it nonetheless ruled that since competitors without interconnection agreements could fax change orders under Ameritech's general tariff provisions, MCI should have the same right, despite its agreement to the contrary.

Ameritech now challenges the MPSC decision to allow MCI to proceed under the general tariff provisions applicable to Ameritech rather than pursuant to the negotiated Agreement between the parties.

For the reasons stated below, this Court finds the MPSC acted arbitrarily and capriciously in allowing MCI to circumvent the Agreement. Accordingly, the Court grants Ameritech's Motion for Summary Judgment.

## II. *The Contentions of The Parties*

### A. *Ameritech's Motion*

Ameritech presents this case as a straightforward one involving only the interpretation of the Agreement under general contract principles.

Section 10.13.2(a) of the Agreement required Ameritech to provide an electronic interface for change orders and to update the interface as necessary to comply with industry standards.

*Electronic Interface for Pre–Ordering, Ordering and Provisioning.*

Ameritech will provide an electronic interface for the transfer and receipt of data necessary to perform the pre-ordering, ordering, and provisioning functions (*e.g.*, order entry, telephone number selection, and due date selection) associated with Resale Services.... [A]s an industry standard interface is developed by the appropriate industry forum, and generally accepted for implementation by the industry, Ameritech shall implement such interface....

(Ameritech Br., Ex. 1 at 41–42).

Section 10.13.2(b) required that change orders be made via the electronic interface described in § 10.13.2(a). "Service orders will be placed by MCImetro and provisioned by Ameritech in accordance with the procedures described in this Section 10.13 and the Implementation Plan." (Ameritech Br. Ex. 1 at 42). The Implementation Plan to which Section 10.13.2(b) refers provides that, "[t]he Manual Ordering Pro-

cess [i.e. ordering by fax] is intended as an interim and back-up mode only."

The Agreement contained an integration clause, which incorporated only those terms of the Agreement and other documents specifically referenced there:

> **30.18 Entire Agreement.** The terms contained in this Agreement and any Schedules, Exhibits, tariff provisions referenced herein and other documents or instruments referred to herein, which are incorporated into this Agreement by reference, constitute the entire agreement between the Parties with respect to the subject matter hereof, superseding all prior understandings, proposals and other communications, oral or written. Neither party shall be bound by any terms additional to or different from those in this Agreement that may appear subsequently in other Party's form documents, purchase orders, quotations, acknowledgments, invoices or other communications. This Agreement may only be modified by a writing signed by an officer of each Party.

(Ameritech's Br., Ex. 1, last page). Additionally, § 30.16 of the Agreement stresses, "This Agreement does not obligate either Party to provide arrangements not specifically provided herein." (Ameritech's Br., Ex. 1 at 103).

As recognized by the MPSC, the provisions of the Agreement requiring electronic submission of change orders resulted from MCI's own opposition to manual ordering:

> Throughout the arbitration of their interconnection agreement, MCI stressed the importance of being able to submit orders electronically and argued that the inability to do so would place MCI at a competitive disadvantage. Repeatedly, MCI argued that manual access arrangements were simply not compatible with its needs as a new entrant seeking to compete against an entrenched incumbent. MCI opposed being limited to manual ordering because of delay in processing manual orders, the significant risk of error, and increased administrative costs.

(Ameritech's Br., Ex. 2 at 17).

Indeed, Ms. Ali Miller, MCI's market manager for local services in the Ameritech region, submitted the following testimony to the Commission during that process:

> Every manual intervention causes delay, sometimes substantial, and creates significant risk of error. By relying upon manual interventions, Ameritech can hold its competitors hostage to its own response time, hours of operation, and ability (or incentive) to provide accurate information. Also, manual arrangements increase CLECs' costs in two ways: CLECs must employ more people to handle the process and to audit Ameritech's performance; and Ameritech will try to pass its own inflated costs through the CLECs. Accordingly, solutions that require manual intervention on Ameritech's side cannot be acceptable in either the short or long term.
>
> \* \* \* \* \* \*
>
> Customers demand prompt and accurate information regarding the timely provision of telecommunication services. Consequently, CLECs like MCI require a mechanized interface for both resold and unbundled services in order to provide timely and up-to-date information regarding the status, potential delay, and final completion of the provisions of these services.

Hence, the parties agreed that electronic ordering would be the exclusive means that they would use for ordering services for resale.

The Defendants dispute none of the above.

In March 1999, Ameritech informed MCI that it was going to upgrade its electronic interface to become Y2K ready. In order to maintain compatibility, MCI was requested to complete the same upgrade by June 30, 1999 (MCI Br., Ex. H). In

response, a representative of MCI sent an email informing Ameritech that it (MCI) decided not to upgrade its electronic interface and that it would instead fax change orders (Ameritech Br., Ex. 5). According to MCI, its change of position resulted from a plummeting of the number of resale service orders MCI was placing with Ameritech, down to 3 to 5 per day (MCI Br. at 7). Under those circumstances, MCI viewed the funding of an electronic interface upgrade is " 'throwing money down a rat hole.' " (Quote of former MCI President and COO, Timothy F. Price, Ameritech Br., Ex. 2 at 17).

Ameritech responded by letter on May 26, 1999, lambasting MCI's "unilateral funding decision" to fax orders to Ameritech. MCI did not heed Ameritech's objections and, instead, proceeded to fax change orders to Ameritech. After Ameritech refused to process those faxed orders, MCI filed a complaint with the MPSC.

Ameritech contends that the MPSC misinterpreted the Agreement when it concluded that the agreement did not preclude MCI from submitting faxed change orders pursuant to Ameritech's general tariff because, according to the MPSC, the Agreement did not specifically prohibit either party from availing itself, of the tariff.

Further, Ameritech argues, the integration clause establishes that the parties did not intend that MCI be permitted to invoke the tariff. Only tariff provisions referenced in the Agreement were made part of the agreement.

Ameritech contends that the MPSC decision violated federal law because the Act deems interconnection agreements binding on the parties. Ameritech additionally relies upon the *Sierra–Mobile* doctrine, and distinguishes the *Strand* decision, both discussed below.

### B. *The Commissioners' Response*

The MPSC Commissioners argue that the decision to allow MCI to fax change orders is consistent with the pro-competi-tion and anti-discrimination goals of the Act. Denying MCI the right to fax change orders in the manner other CLECs are allowed would be discriminatory.

According to the MPSC, it was Ameritech's responsibility to get MCI to waive the requirements of the tariff. Absent such a waiver, nothing prevented MCI from ordering services pursuant to the tariff. In addition, the MPSC placed the burden on Ameritech to demonstrate that it is not discriminating against MCI by excluding it from the tariff.

Further, the MPSC's contends that its actions did not violate the Act because it has the authority to prescribe regulations deemed necessary to further competition. Also, the *Sierra–Mobile* "exception" to the filed rate doctrine is inapplicable here, because MCI is only accepting the terms of another offer, not unilaterally filing a new tariff. The MPSC additionally relies upon the filed rate doctrine described in *Global Access Ltd. v. AT&T Corp.*, 978 F.Supp. 1068 (S.D.Fla.1997).

### C. *MCI's Response*

MCI contends that this Court is without jurisdiction to review the MPSC's interpretation of the Agreement because it is governed by State law. MCI asserts that this Court's scope of review is limited to determining whether the MPSC's decision violated federal law.

MCI then turns to its argument that the Act did not extinguish MCI's state law right to submit change orders pursuant to the tariff. Under Michigan law, Ameritech cannot refuse to sell tariffed services to any competing carrier. Also, although the Agreement was "binding," that term is distinguishable from "exclusive." This is especially true in light of the Act's reservation of State authority.

Like the MPSC, MCI contends that a ruling in favor of Ameritech would subvert the Act's goal of nondiscrimination. It further argues that the "pick and choose" rule of § 252(i) of the Act does not pre-

clude CLECs which have entered into interconnection agreements from purchasing under and availing themselves of, state tariff provisions. The decision in *Michigan Bell · Telephone Co. v. Strand*, 26 F.Supp.2d 993 (W.D.Mich.1998), is directly on point and sanctions allowing MCI to rely upon the tariff, MCI asserts.

Regarding opinions holding that interconnections agreements control over tariffs, MCI states that they were wrongly decided. Congress never intended such agreements to be unchanging or to be the sole method for a carrier to purchase services, according to MCI.

## III. *Applicable Law*

### A. *Summary Judgment Standard*

Ameritech contends it is entitled to summary judgment against the Defendants because of the clear and unambiguous language of the Agreement. Under Fed. R.Civ.P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir.1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir.1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. Ag Trucking, Inc.*, 57 F.3d 484, 488 (6th Cir. 1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox,* 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir.1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. Rule 56(e); *Cox,* 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland,* 57 F.3d at 479.

The Telecommunications Act of 1996 is the statute on which Ameritech contends it is entitled to judgment as a matter of law.

### B. *The Telecommunications Act of 1996*

In order to further competition, the Act requires an ILEC such as Ameritech, to provide access to its customers by, *inter alia,* eliminating physical and financial barriers.

Title I, Part II of the Act provides standards and procedures to allow startup carriers to interconnect their networks to the incumbent carrier's network, to access the incumbent carrier's network elements piece-by-piece, to purchase the incumbent carrier's retail services 'at wholesale rates' for resale, and to access the incumbent carrier's physical infrastructure and facilities for connection purposes. 47 U.S.C. §§ 251(b)(4) and 251(c)(6).

*Michigan Bell Telephone Co. v. Climax Telephone Co.*, 202 F.3d 862, 865 (6th Cir. 2000).

In addition to imposing a duty of good faith negotiation on ILECs, § 251(c)(1), the Act provides other mechanisms for assuring that CLECs are able to achieve fair agreements with ILECs. If negotiations fail, either party may petition the state commission to arbitrate open issues. Section 252(b). An ILEC's or CLEC's failure to cooperate in negotiations or with the arbitration process "shall be considered a failure to negotiate in good faith." Section 252(b)(5).[1]

Further, regardless of whether the interconnection agreement was achieved by way of negotiations or arbitration, the State commission must approve the agreement. Section 252(e). Any appeal of the State commission's decision must be made to federal court.

> In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

Section 252(e)(6).

The question raised by § 252(e)(6) is what constitutes "a determination under this section." On its face, § 252 addresses only the procedures for negotiating and/or arbitrating an interconnection agreement. However, § 252 has been interpreted to instill a broader type of authority in State commissions:

> The Act's reference to 'a State commission ... determination under this section [252],' could, if construed quite narrowly, limit state commission jurisdiction to decisions approving or disapproving, or arbitrating, an interconnection agreement. Under such a narrow construction, commission jurisdiction

would not extend to interpreting or enforcing a previously approved contract. We do not think so narrow a construction was intended. Rather, we are satisfied that the Act's grant to the state commissions of plenary authority to approve or disapprove these interconnection agreements necessarily carries with it the authority to interpret and enforce the provisions of agreements that state commissions have approved. *See Iowa Utils. Bd. v. FCC,* 120 F.3d 753, 804 (8th Cir.1997), *aff'd in part, rev'd in part on other grounds, AT&T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). We believe that the FCC plainly expects state commissions to decide intermediation and enforcement disputes that arise after the approval procedures are complete.

*Southwestern Bell Telephone Co. v. Public Utility Com'n of Texas,* 208 F.3d 475, 479–480 (5th Cir.2000).

However, there is no question that by enacting the Act, Congress diminished the authority of the States to regulate local telecommunications competition. "[T]he question ... is not whether the Federal Government has taken the regulation of local telecommunications competition away from the States. With regard to the matters addressed by the 1996 Act, it unquestionably has." *Id.* at 378, n. 6, 119 S.Ct. 721. Nonetheless, while the States' authority has been diminished, the Act reserved a role for them. The Act is a "scheme of cooperative federalism" in which Congress reconciled "such competing interests as federal uniformity and state autonomy." *Southwestern Bell Telephone Co. v. Connect Communication Corp.,* 225 F.3d 942, 948 (8th Cir.2000). In attempting reconcile these competing interest, the Act's delineation between the federal and state

---

1. It should further be noted that § 252(i) provides, "A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunica-tions carrier upon the same terms and conditions as those provided in the agreement." This is known as the "pick and choose" rule *AT & T Corp. v. Iowa Utilities Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

authority is not clear. "It would be gross understatement to say that the Telecommunications Act of 1996 is not a model of clarity." *AT&T* at 397, 119 S.Ct. 721. As a consequence, litigation to resolve the federal-state ambiguities has abounded.

## IV. *ANALYSIS*

At first glance, the factual underpinnings of the instant dispute may appear trivial. MCI submits only about 3 to 5 change orders per day to Ameritech (Ameritech's Br., Ex. 2 at 3). After reviewing the case, the MPSC described the controversy at issue this way: "In the ALJ's words, 'the subject matter or what's at issue in terms of the magnitude of dollars involved is Judge Wappner [sic] stuff, People's Court.'" (Ameritech's Br., Ex. 2 at 25).

Yet, there is a much larger issue at stake. At stake is whether, under the scheme of cooperative federalism envisioned by the Act, the provisions of the Interconnection Agreement are binding on MCI. Or, as MCI contends, may it opt to rely upon portions of Ameritech's tariff that conflict with the Interconnection Agreement?

### A. *Jurisdiction*

■ Despite MCI's contention to the contrary, this Court holds that it has jurisdiction to review the MPSC decision that the electronic processing provision of the Agreement can give way to the faxing provision of Ameritech's general tariff. In doing so, the Court follows the broader interpretation of federal jurisdiction in these matters that have been adopted in the Ninth, Fourth, Fifth and Tenth Circuits. *See U.S. West Communications v. MFS Intelenet, Inc.,* 193 F.3d 1112, 1117, 1124 n. 15 (9th Cir.1999); *GTE South, Inc. v. Morrison,* 199 F.3d 733, 745 (4th Cir. 1999); *Southwestern Bell,* 208 F.3d at 482; *Southwestern Bell Telephone Co. v. Brooks Fiber Communications of Oklahoma, Inc.,* 235 F.3d 493, 498 (10th Cir.2000).

As the Tenth Circuit reasoned, federal review of State law issues in cases involving the Act represents a proper exercise of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). *Brooks Fiber,* 235 F.3d at 498. "In addition, having decided that the state commissions have the authority to interpret and enforce interconnection agreements and that the appropriate forum for review of these decisions is federal court, it would be a waste of judicial resources to limit the court's consideration to federal issues only." *Id.*

Importantly, the Sixth Circuit has endorsed federal review of State law issues in Telecommunications Act cases. A Western District of Michigan judge observed that, since § 252(e)(4) expressly deprives State courts with jurisdiction over cases relating to interconnection agreements, "federal courts very well may provide the only forum for review of state law issues arising in relation to interconnection agreements." *Michigan Bell Telephone Co. v. Climax Telephone Co.,* 121 F.Supp.2d 1104, 1115 (W.D.Mich.2000). Thus, if as MCI contends, this Court cannot interpret the Interconnection Agreement, neither party would have a forum to review the MPSC's interpretation of that Agreement.

Additionally, the Sixth Circuit Court recently held that a federal court has jurisdiction to review any State order that permits circumvention of Act requirements:

> There is no evidence that Congress intended § 252(e)(6), which grants federal courts exclusive jurisdiction to review for FTA compliance state commission orders approving or rejecting interconnection agreements, to preclude federal review of state law orders that permit telecommunications carriers to circumvent the procedures prescribed in the FTA for negotiating network access.

*GTE North, Inc. v. Strand,* 209 F.3d 909, 919 (6th Cir.2000).

Furthermore, the Sixth Circuit among others, has held that State public service commissioners may be sued in federal

court. *Michigan Bell Telephone Co. v. Climax Telephone Co.,* 202 F.3d 862, 867–868 (6th Cir.2000). Pursuant to the *Ex parte Young* doctrine, a suit against state officials seeking equitable relief of ongoing violations of federal law is not barred by the Eleventh Amendment. *Id.* at 867.

If Ameritech is correct in its claim that the agreement violates federal law, the PSC's ongoing enforcement of the interconnection agreement constitutes an ongoing violation of federal law, against which Ameritech seeks injunctive relief. Therefore, under *Ex parte Young,* the Eleventh Amendment does not bar Ameritech's suit against the Commissioners. *Id.* at 868.

Accordingly, this Court holds that it has jurisdiction to review the MPSC's interpretation of the Agreement, under both State and federal law.

**B. *Scope of Review***

■ The Court is permitted to consider *de novo* whether the MPSC's decision is in compliance with the Act, but must review all other issues decided by the MPSC under an arbitrary and capricious standard. *Southwestern Bell,* 208 at 482. In *MCI Telecommunications Corp. v. Michigan Bell Telephone Co.,* 79 F.Supp.2d 768, 773 (E.D.Mich.1999), the court provided the following principles to consider when applying the arbitrary and capricious standard:

In determining whether a decision is arbitrary and capricious, a court must consider whether the decision was based on the relevant factors and whether there was a clear error of judgment. *Hix,* 986 F.Supp. at 18.

'Generally, an agency decision will be considered arbitrary and capricious if the agency had relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not

be ascribed to a difference in view or the product of agency expertise. The Court is not empowered to substitute its judgment for that of the agency.'

*Id.* (*citing Friends of the Bow v. Thompson,* 124 F.3d 1210, 1215 (10th Cir.1997) (citations omitted)).

When applying the arbitrary and capricious standard to an agency's actions, the court must review only the reasons articulated by the agency. "We may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), *quoting SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947). This rule been applied by district courts in their review of State public service commission decisions in Telecommunications Act cases and related matters. *See MCI Telecommunications,* 79 F.Supp.2d at 773, ("A court can uphold the state commission's decision only on the grounds set forth in the decision."); *MCI Telecommunication Corp. v. Bell Atlantic–Virginia, Inc.,* 1998 U.S.Dist. LEXIS 17558, *17 (E.D.Virg.1998) ("A court may only uphold agency actions on the basis articulated by the agency itself.").

Consequently, justifications of the MPSC's decision made by it and MCI that differ from, or are in addition to, those articulated in the decision, are rejected by this Court.

**C. *The Court Finds that the MPSC's Interpretation of the Agreement was Arbitrary and Capricious***

The MPSC found that the plain language of the Agreement required MCI to electronically submit change orders. Further, it rejected MCI's claim that provisions of the Agreement authorized it to rely on the tariff provisions. Nevertheless, the MPSC held that the Agreement did not forbid MCI from relying on a contrary tariff provision. The Court finds

that this interpretation of the Interconnection Agreement was a clear error of judgment and an arbitrary and capricious one, in at it runs counter to the evidence. *MCI Telecommunications,* 79 F.Supp.2d. at 773.

In finding that the Agreement required electronic filing of change orders, the MPSC stated:

> An examination of the entire interconnection agreement reveals that in Section 1.3(a), the parties specifically provided that the word 'will' connotes a mandatory requirement. Further, the parties also indicated that the use of the word 'will' should not be interpreted to 'mean a different degree or right or obligation for either Party.' Interconnection agreement, p. 2. Because the word 'will' used in Section 10.13.2(b) must be interpreted as pertaining to a mandatory requirement, the Commission is persuaded that the language 'Service Orders will be placed by MCIm' is a mandatory provision and requires MCI to place MACD orders in accordance with Section 10.13 of the interconnection agreement and the implementation plan.

> . . . . .

> The implementation plan is consistent with Ameritech's position that Section 10.3.2(b) requires use of the electronic interface for placement of service orders by MCI. Paragraph 1.3b of Section D of the implementation plan, which concerns resale, specifically indicates that '[t]he Manual Ordering Process is intended as an interim and back-up mode only.'
> . . . .
> Given the clear and unambiguous language of the interconnection agreement and the implementation plan, the Commission finds that Ameritech Michigan's exception to the PFD's finding that the interconnection agreement does not require MCI to use the electronic interface to place MACD orders is meritorious and should be granted.

(Ameritech's Ex. 2 at 11–13).

Additionally, the MPSC ejected MCI's claim that provisions of the Agreement specifically permit MCI to use the manual ordering procedures set forth in Ameritech Michigan's tariffs.

MCI cites Section 10.2 of the interconnection agreement, which provides as follows:

> Each Party shall make available to the other Party its Telecommunication Services for resale at retail rates ('**Retail Resale Services**') in accordance with Section 251(b)(1) of the Act and applicable tariffs.

Section 10.2, interconnection agreement, p. 32. [Bold in original.]

MCI argues that Section 10.2 requires Ameritech Michigan [to] make available to MCI its resale services pursuant to the provision in Tariff M.P.S.C. No. 20R, Part 22, which permits faxed MACD orders. According to MCI, the purpose of Section 10.2 is to avoid discrimination by requiring Ameritech to make available to MCI all of the provisions contained in Ameritech Michigan's applicable resale tariff.

MCI insists that its interpretation of Section 10.2 of the interconnection agreement is reinforced by Section 10.3.3, which provides in pertinent part:

> Each Party acknowledges that Resale Services shall be available to MCIm on the same basis as offered by Ameritech to itself or to any subsidiary, Affiliate, or any other person to which Ameritech directly provides the Resale Services, including Ameritech's retail Customers and other resellers of Ameritech's Telecommunications Services.

Section 10.3.3, interconnection agreement, p. 33.

However, the Commission agrees with Ameritech Michigan's argument that MCI's citations to Section 10.2 and 10.3.3 of the interconnection agreement are misplaced. On its face, Section 10.2 concerns retail resale services and has nothing to do with the purchasing of

resale services at wholesale rates, which is the subject of MCI's complaint. . . .

Section 10.1 of the interconnection agreement concerns Ameritech Michigan's obligation pursuant to Section 251(c)(4) of the FTA to offer for resale at wholesale rates any telecommunications services that Ameritech Michigan provides at retail to subscribers who are not telecommunication carriers. . . . However, in carrying out the requirements of Section 251(c)(4) of the FTA, the interconnection agreement specifically provides that Ameritech Michigan's offering of its telecommunication services to MCI for resale at wholesale rates shall be '[s]ubject to the terms, conditions and limitations set forth in this Agreement.' Section 10.1, interconnection agreement, p. 31. Accordingly, at least as to the resale of telecommunications services at wholesale rates, the most reasonable interpretation of the interconnection agreement is that the ordering of such services is controlled by Section 10.13.2(b). Moreover, in light of the clear and unambiguous language used in Section 10.13.2(b), the Commission is not persuaded by MCI's arguments that Sections 10.1, 10.2, and 10.3.3 authorize MCI to place MACD orders pursuant to Ameritech Michigan's resale tariff rather than in accordance with the interconnection agreement.

(Ameritech Br., Ex. 2 at 14–15).

In the end, the MPSC "determined that nothing in the interconnection agreement supports MCI's position that Ameritech Michigan must accept MCI's faxed MACD orders. . . ." (Ameritech Br., Ex. 2 at 17). This finding should have been determinative. However, in holding otherwise, the MPSC relied in part on the fact that the Agreement did not specifically preclude MCI from invoking a contrary tariff provision:

While the language used in Section 10.13.2(b) of the interconnection agreement is mandatory regarding the process for ordering services to be provided pursuant to the agreement, the interconnection agreement does not expressly state that MCI is prohibited from availing itself of any general applicable tariff provisions. The parties could have included such a provision in the interconnection agreement. They did not.

(Ameritech's Br., Ex. 2 at 20–21).

The MPSC's analysis, as Ameritech suggests, is akin to stating that, while a contract mandates white paint, yellow paint is okay unless it is specifically excluded. The MPSC's analysis literally took the mandate out of the provision it found to be mandatory.

Furthermore, the agreement evidenced an intent to be comprehensive with respect to the matters covered in it. Section 30.18 stated:

The terms contained in this Agreement and any Schedules, Exhibits, **tariff provisions referenced herein** and other documents or instruments referred to herein, which are incorporated into this Agreement by reference, **constitute the entire agreement between the Parties with respect to the subject matter hereof, superseding all prior understandings, proposals and other communications, oral or written.** Neither party shall be bound by any terms additional to or different from those in this Agreement that may appear subsequently in other Party's form documents, purchase orders, quotations, acknowledgments, invoices or other communications. This Agreement may only be modified by a writing signed by an officer of each Party.

(Ameritech's Br., Ex. 1, last page, emphasis added).

Diminishing the import of § 30.18, the MPSC truncated that section and found that "Section 30.18 is not applicable because MCI has not attempted to impose new terms through a subsequent purchase order or communication as discussed in that section." The MPSC completely ignored the main thrust of § 30.18: that

"[t]he terms contained in this Agreement and any ... tariff provisions referenced herein ... constitute the entire agreement between the Parties with respect to the subject matter hereof...." The portion of § 30.18 stating that neither party could impose a new term by way of a subsequent purchase order or the like is only an elaboration of the parties' intent that the Agreement be considered comprehensive and complete.

Hence, the Court finds that the MPSC clearly erred in relying upon the limited portion of § 30.18 that prohibited the parties from imposing new terms via subsequent purchase orders or communications.

Further, since the manner in which MCI was allowed to submit a change order was clearly part of the subject matter of the Agreement, the Court finds that, pursuant to § 30.18, the parties intended for electronic filing to be the *exclusive* means by which MCI could submit change orders.

### D. *The Court Finds that the MPSC's Decision is a Violation of the Act*

■ The Court further finds that the MPSC's decision violated the Act. Under the Act, interconnection agreements are binding documents. 47 U.S.C. § 252(a)(1) provides:

> Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title. The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement. The agreement, including any interconnection agreement negotiated before February 8, 1996, shall be submitted to the State commission under subsection (e) of this section.

Both the MPSC and MCI point out that the Act allows the State to continue regulating local telephone traffic. However, such regulation must be consistent with the Act. Section 261(c) states:

> Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are necessary to further competition in the provision of telephone exchange service or exchange access, as long as the State's requirements are not inconsistent with this part or the Commission's regulations to implement this part.

Similarly, § 251(d)(3) clarifies:

> In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that—
>
> (A) establishes access and interconnection obligations of local exchange carriers;
>
> (B) is consistent with the requirements of this section; and
>
> (C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

Thus, while the State may continue to enforce tariff provisions, it must do so in a manner that is consistent with the Act. By enforcing the tariff provision in this case despite MCI's contrary binding obligation in the Agreement, the State has regulated in a manner that is inconsistent with the Act. In other words, the Court finds that, pursuant to the Act, the State may impose and enforce tariff provisions, but cannot enforce a tariff in a manner that violates a party's rights under negotiated interconnection agreement.

### 1. *Other Decisions Support a Finding that the MPSC's Order Violated the Act*

This Court's holding is consistent with other decisions where identical or similar

issues have been addressed. For example, in *In re U.S. WEST Communications, Inc.*, 1998 WL 992036, *36 (Or.P.U.C. Nov 13, 1998), the Oregon Public Utility Commission held, "[C]arriers bound by interconnection agreements should not be permitted to use the building block tariff to supplement or supplant any terms, conditions, or prices that are covered in an interconnection agreement."

Likewise, in a matter substantially identical to the instant dispute, the Illinois Commerce Commission ruled that the terms of an interconnection agreement controlled over those in a tariff.

In Court I of its complaint, MCI alleges that Ameritech's resale tariff clearly allows MCI to submit faxed MACDs to Ameritech. In its brief, MCI argues that Ameritech's refusal to accept and process faxed resale orders that it receives from MCI 'is a direct violation of Ameritech's resale tariff offering.' (MCI brief at 6).

. . . . .

Having reviewed the record on these issues, and subject to the determinations made below, the Commission first concludes that MCI is not permitted to utilize the provisions of a tariff in a manner that is directly contrary to the terms of the parties' Commission-approved Interconnection Agreement entered into pursuant to Sections 251 and 252 of the 1996 Act. As discussed above, the Agreement limits the use of manual ordering to 'interim and backup' situations only, and it does not permit MCI to place faxed MACD orders in the manner proposed by MCI. To allow MCI to avoid its obligations under the Agreement by simply invoking the terms of a tariff would have the effect of allowing one party to unilaterally amend the agreement. Such a result would undermine the integrity of the contract and the process of which it is a part, and would frustrate the federal scheme favoring individually negotiated agreements under the Telecommunication

Act, as explained in *Global Access* and other decisions.

*MCImetro Access Transmission Services, Inc v. Illinois Bell Telephone Co*, docket 98–0379, p. 32 (September 10, 1999).

*MCImetro*'s recognition that to allow MCI to avoid its obligation under the interconnection agreement would frustrate the federal scheme favoring individually negotiated contracts, is especially germane in light of the fact that § 251(d)(3)(C) allows State regulation only to the extent that it "does not substantially prevent implementation of the requirements of this section and the purposes of this part."

In *U.S. West Communications, Inc. v. Hix*, 93 F.Supp.2d 1115 (D.Colo.2000), the court likewise held that allowing a party to an interconnection agreement to rely upon a contrary tariff provision would eviscerate the Act. In its conclusions of law, the court stated:

6. The Court finds that allowing a CLEC that has executed an interconnection agreement to use a tariff to supplement or supplant any term, condition, or price that is covered by the agreement VIOLATES the Act. That is because such a provision would eviscerate the provisions of 251 and 252 of the Act which require that the parties negotiate the terms of an interconnection agreement and arbitrate those terms that they are not able to agree to. As one court stated the issue, [ ]permitting CLECs to incorporate non-negotiated tariff provisions into their interconnection agreements 'bypasses the Act entirely and ignores the procedures and standards that Congress has established.' *MCI Telecommunications Corp. v. GTE Northwest, Inc.*, 41 F.Supp.2d 1157, 1178 (D.Or.1999).

. . . . .

8. Furthermore, permitting CLECs to 'pick and choose' from tariff provisions may undermine federal court review of interconnection obligations under the Telco Act. The CPUC [Colorado

Public Utilities Commission] in other proceedings in this Court ... has taken the position that interconnection agreements and the approval or rejection of same are the only thing subject to review in federal court under 47 U.S.C. § 252(e)(6). If the CPUC's argument were accepted, the CPUC and/or other carriers could not be sued in federal court for review of interconnection tariffs that were opted into by a CLEC, essentially eviscerating federal review of interconnection obligations under the Act. The CPUC could simply opt into more favorable provisions in a tariff to avoid the exclusive federal court review Congress envisioned.

*Id.* at 30–31.

In an analogous case, *MCI Telecommunications Corp. v. GTE Northwest, Inc.*, 41 F.Supp.2d 1157, 1178 (D.Or.1999), the court agreed that the scheme calling for individually negotiated, terms and conditions of an agreement are essential aspects of the Act. The state commission in *GTE Northwest* attempted to require GTE to file a tariff that included mandatory unbundled elements at prices fixed by the commission. If that were allowed, the court held, a CLEC would thereby be able to bypass the negotiation and enforcement procedures of the Act.

> [T]he state has done more than simply enforce additional state requirements. It has required GTE to sell unbundled elements or services for resale, to CLEC's, via a procedure' that bypasses the Act entirely and ignores the procedures and standards that Congress has established.
>
> The PUC may take steps to expedite the interconnection process, but it must do so within the overall framework established by the Act. Before purchasing finished services or unbundled elements from an ILEC, each CLEC must enter into an interconnection agreement. **GTE must have the right to ask the CLEC, and the PUC, to include additional or different terms in a particular agreement if GTE believes special circumstances exist.** With the exception of negotiated deviations as provided in § 252(a)(1), the agreement must comply with the substantive standards established by the Act (and by the FCC, where appropriate). Finally, GTE must have the right to seek judicial review of any agreement by the federal court pursuant to § 252(e)(6).

*MCI v. GTE Northwest* at 1177–1178, (emphasis added).

Similarly, the court in *Global Access Ltd. v. AT&T Corp.*, 978 F.Supp. 1068 (S.D.Fla.1997), held that a carrier should not be allowed to frustrate the federal scheme favoring negotiated contracts. *Global Access* concerned a dispute under the Communications Act of 1934, 47 U.S.C. § 151, et seq. The 1934 Act applies to interstate communication rather than local phone traffic. Similar to the interconnection agreements created under the Act, a 1991 amendment to the 1934 Act allows for "contract tariffs." The parties in *Global Access* had entered into such a tariff, but, unilaterally, AT & T later filed a modified contract tariff. In passing upon the validity of the modified tariff, the court first noted the primacy of contract law.

> The U.S. Supreme Court has held that in a regulatory regime that permits the relationship between the parties to be established by private contract, a utility may not alter a material term of the parties' agreement without the customer's consent simply by filing a unilateral tariff amendment. *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 338–40, 76 S.Ct. 373, 378, 100 L.Ed. 373 (1956); *Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). This principle has become to be known as the *Sierra–Mobile* doctrine. It dictates the primacy of contract law in determining whether carriers may unilaterally revise agreed-upon rates and terms simply by amending their tariffs. Except in limited exceptions not applicable here, a tar-

iff amendment filed without the customer's consent contrary to the terms of the contract is 'a nullity.' *Mobile,* 350 U.S. at 347, 76 S.Ct. at 382.

*Global Access* at 1073.

The *Global Access* court acknowledged the filed rate doctrine, which AT & T argued applied in that case, and which the MPSC argues applies to this case:

> The filed rate doctrine holds that 'where a regulated company has a rate for service on file with the applicable regulatory agency, the filed rate is the only rate that may be charged.' *Florida Mun. Power Agency v. Power & Light Co.,* 64 F.3d 614, 615 (11th Cir.1995). Simply put, this judicially-created doctrine states that 'a tariff filed with the FCC supersedes all other agreements between the parties.' *MCI Telecomm. Corp. v. Best Tel. Co.,* 898 F.Supp. 868, 872 (S.D.Fla.1994) (J. Moore). Thus, arguments of fraud or mistake are of no merit. A party cannot dispute a filed rate on the grounds that he was fraudulently induced into the contract by representations that the rate would be lower, because customers are presumed to know what the applicable tariff is. *Id.* Application of the filed rate doctrine can at times be harsh, but its justification lies in the principle that carriers should not be able to discriminate against customers in the setting of service rates; one rate—the filed rate—is the applicable rate for all regardless of private agreements to the contrary.

*Id.*

What the MPSC neglects to mention that the *Global Access* court, while discussing the filed rate doctrine, found that it was the *Sierra–Mobile* doctrine that applied instead.

> The Court agrees with Global that the *Sierra–Mobile* doctrine controls the resolution of these motions. While an FCC-filed contract tariff is not identical to the contracts that in *Sierra* and *Mobile* were permitted under the Natural Gas Act and Federal Power Act, the FCC has stated that those acts are 'similar in several significant respects to the Communications Act,' *BELL SYSTEM TARIFF OFFERINGS,* 46 F.C.C.2d 413, 432 (1974), and both the FCC and the courts have universally applied the *Sierra– Mobile* doctrine to telecommunications agreements, in striking down attempts by AT & T and other carriers to alter unilaterally the terms of contract tariffs between carriers where the language of the CT Order did not authorize such unilateral amendment.

Additionally, the court held that allowing AT & T to unilaterally amend the contract tariff would undermine the federal scheme.

> Moreover, the entire justification for implementing the 1991 changes would be defeated without the protection of the *Sierra–Mobile* doctrine. As discussed above, the FCC made clear in its August 1, 1991 Report and Order that the contract tariff regime promotes efficiency (by allowing specially tailored, personalized contracts) and competitive pricing (by making negotiated contracts generally available to similarly situated customers). If a common carrier such as AT & T could simply amend its filed contract tariffs and alter the terms of the contract—for example, when it realizes that it has given too good a deal to one customer and does not wish to offer such terms to other similarly situated customers—then the FCC's stated goals would be frustrated, and the contract tariff regime rendered meaningless.

*Id.* at 1074.

Although *Global Access* presents a distinguishable fact pattern, its message is applicable to this case: if a common carrier, such as MCI, can simply invoke a tariff provision that is contrary to its interconnection agreement when it no longer likes its agreement, the Act's goals would be frustrated and the interconnection agreement regime rendered meaningless. And, since the Telecommunications Act favors individually negotiated arrangements, *MCI*

*v. GTE Northwest* at 1177–1178, the judicially-created preference of one rate for all should not be applied to Telecommunications Act cases.

In support of the claim that the MPSC is entitled to enforce the tariff in this case, the MPSC and MCI also rely heavily upon *Michigan Bell Telephone Co. v. Strand,* 26 F.Supp.2d 993, 1000–1001 (W.D.Mich. 1998). The Court finds however, that that opinion does not support the MPSC's decision.

In *Strand,* the court upheld an order of the MPSC that Ameritech claimed modified its interconnection agreements with MCI. In the order at issue, the MPSC determined the rates for "common transport," which was defined as being synonymous with "shared transport," a term used by the Federal Communication Commission. The interconnection agreements at issue included provisions concerning shared transport. In the action before the district court, Ameritech argued that the MPSC's order effectively replaced the "shared transport tariffs" with something different—"common transport tariffs." The new requirement was imposed without the negotiation, mediation or arbitration procedures authorized by the Act, Ameritech contended. The court disagreed, holding that the MPSC order constituted a consistent State regulation.

> Plaintiff's claims fail to state cognizable legal claims for two separate and independent reasons. First, the Section 252 negotiation procedure is not the sole means for the MPSC under the federal statutes to order and regulate telecommunications. Under Section 261(c), state commissions are explicitly permitted to impose requirements to further competition for intrastate services as long as the requirements are consistent with the Telecommunications Act. Under Section 251(d)(3), the MPSC may enforce its own regulations to the extent they: (a) establish access and interconnection obligations of local exchange carriers; (b) are consistent with Section 251; and (c) do not substantially prevent implementation of the Telecommunications Act. **The requirement of 'common transport'—to the extent of any minimal difference between it and 'shared transport'—represents such a state regulation.** It was done under state law precisely to foster and encourage state competition (by AT & T, MCI and other such companies) as to telephone services and does not in any way interfere with the requirements of the Act or the implementation of the Act. As such, the tariffs are permissible as consistent state regulation. **Second, there is no real distinction between the common transport ordered and the shared transport previously agreed as part of the interconnect agreements.** 'Shared Transport' is defined in the agreements identically to the FCC regulations covering the same. See 47 C.F.R. S 51.319(d)(1). This same regulatory language was upheld by the Eighth Circuit in *Southwestern Bell* and was used by the MPSC in reference to both 'shared' and 'common' transport in its January Order. (See Order at 15 n. 5.) Ameritech's argument, that 'common transport' is something different from 'shared transport' because it includes an unauthorized combination of transport and switching, squarely ignores the language of the January Order as well as the outcome of the holding in *Southwestern Bell.*

*Strand* at 1000–1001, (emphasis added).

The *Strand* decision does not allow the MPSC to enforce a tariff provision that is directly contrary to an interconnection agreement. Indeed, the *Strand* court specifically found that there was no significant difference between the shared transport requirement of the interconnection agreement and the common transport requirement in the tariff. Further, while the *Strand* court held that the State could impose the common transport requirement, it could do so only "to the extent of any minimal difference between it and 'shared transport' . . . ." *Id.* at 1000.

Hence, the *Strand* court interpreted the Act as allowing the State to impose different, not inconsistent, regulations. This Court finds, therefore, that *Strand* does not support the MPSC's decision to allow MCI to rely upon a tariff provision that is directly contrary to the Interconnection Agreement. And, even if *Strand* could be interpreted to allow the imposition of an inconsistent tariff provision, this Court declines to follow it, as the weight of decisions is to the contrary.

## 2. The Court rejects the MPSC's and MCI's discrimination arguments

In their briefs and arguments to this Court, the MPSC and MCI assert that requiring MCI to electronically file its change order would be discriminatory because other carriers are allowed to fax their orders pursuant to the tariff. However, in the proceedings before it, the MPSC found MCI's claim of discriminatory treatment to be both without merit and without credibility.

[T]he Commission finds MCI's insistence that Ameritech Michigan's interpretation of the interconnection agreement authorizes Ameritech Michigan to engage in blatant discrimination in violation of state and federal law simply does not ring true in light of the circumstances. Throughout the arbitration of their interconnection agreement, MCI stressed the importance of being able to submit orders electronically and argued that the inability to do so would place MCI at a competitive disadvantage. Repeatedly, MCI argued that manual access arrangements were simply not compatible with its needs as a new entrant seeking to compete against an entrenched incumbent. MCI opposed being limited to manual ordering because of delay in processing manual orders, the significant risk of error, and increased administrative costs. Further, in accessing the credibility of MCI's claims of discrimination, it cannot be overlooked that the dispute arose primarily because MCI made a business decision not to fund the electronic inter-

face upgrade in order to avoid 'throwing money down a rat hole.'

(Ameritech's Br, Ex. 2 at 17).

It is well settled that "[a] court can uphold the state commission's decision only on the grounds set forth in the decision." *MCI Telecommunications*, 79 F.Supp.2d at 773. *Accord, MCI Telecommunication*, 1998 U.S.Dist. LEXIS 17558 at *17, ("A court may only uphold agency actions on the basis articulated by the agency itself."). Since the MPSC rejected MCI's discrimination, this Court should not revive it here.

Moreover, as described above, the Act favors individually negotiated agreements. Consequently, some disparate treatment of carriers is to be expected. As importantly, CLECs have numerous protections against being forced into unfair agreements. The ILEC must negotiate the terms and conditions of agreements with a CLEC seeking access to the ILEC's market in good faith. Section 251(c)(1). If negotiations fail, either party may petition the state commission to arbitrate open issues. Section 252(b). An ILEC's or CLEC's failure to cooperate in negotiations or with the arbitration process "shall be considered a failure to negotiate in good faith." Section 252(b)(5).

Further, regardless of whether an interconnection agreement was achieved by way of negotiations or arbitration, the State commission must approve the agreement. Section 252(e). If the CLEC is still dissatisfied, it may appeal to federal court. Section 252(e)(6).

Moreover, the CLEC has an advantage. It can take advantage of favorable terms provided by the ILEC in interconnection agreements with other CLECs. Section 252(i) provides, "A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement." This is known the "pick and choose" rule. *AT & T Corp.*, 525 U.S. at 395, 119 S.Ct. 721.

In short, the Act scheme assures that CLECs are treated fairly.

### 3. *The Pick and Choose Rule*

 MCI argues that the pick and choose rule of § 252(i) demonstrates that Congress did not mean to preclude CLECs that have entered into interconnection agreements from purchasing under the terms of a State tariff. The Court finds this argument unavailing. The plain language of § 252(i) only allows CLEC to opt into "an agreement approved under this section." State tariffs are obviously not agreements approved under the Act. Further, tariffs are inherently different from interconnection agreements. As recognized by the *Hix* court:

> The Act not only encourages parties to negotiate amongst themselves the terms of interconnection agreements, it imposes an affirmative 'duty to negotiate in good faith in accordance with section 252 of this title the particular terms and conditions of agreements. . . .' 47 U.S.C. § 251(c)(2). To facilitate this duty, parties can voluntarily negotiate interconnection agreements 'without regard' to the standards in Section 251(b)·and (c). 47 U.S.C. § 252(a). Tariff provisions, however, are not entirely voluntary; rather, the state commission must approve them and can impose terms. *See* Colo.Rev.Stat. § 40–3–102.[2] Thus, permitting a CLEC to opt into tariff provisions is much different than permitting them to opt into another interconnection agreement which the incumbent LEC had the opportunity to negotiate. Indeed, there is little incentive for carriers to negotiate if they can simply opt into a more favorable tariff tha[t] the state commission imposes.

*Hix* at 30–31.

Given the inherent difference between interconnection agreements and State tar-

iffs, the Court finds that the language of § 252(i) that permits CLECs to opt only into other interconnection agreements was intentional. Congress intended to allow CLECs to pick and choose from interconnection agreements, but not from State tariffs.

Moreover, the *Hix* court recognized that "permitting CLECs to 'pick and choose' from tariff provisions may undermine federal court review of interconnection obligations under the Telco Act." *Hix* at 31. This is so because "[t]he CLECs could simply opt into more favorable provisions in a tariff to avoid the exclusive federal court review Congress envisioned." *Id.*

### V. *Conclusion*

The MPSC's decision that the Interconnection Agreement did not forbid MCI from faxing change orders pursuant to the tariff was a clear error of judgment. In rendering its decision, the MPSC failed to abide by, clear and unambiguous terms of the Agreement, and the oft cited principles of contract law as summarized in *Zurich Ins. Co. v. CCR and Co.*, 226 Mich.App. 599, 604, 576 N.W.2d 392 (1997):

> [W]here the terms of a contract are unambiguous, their construction is for the court to determine as a matter of law, and the plain meaning of the terms may not be impeached with extrinsic evidence.
>
> It is beyond doubt that the actual mental processes of the contracting parties are wholly irrelevant to the construction of contractual terms. Rather, the law presumes that the parties understand the import of a written contract and had the intention manifested by its terms. Accordingly, a written contract is construed.according to the intentions

2. As in Colorado, tariff provisions in Michigan are not entirely voluntary. For example, under M.C.L § 484.2357(4), tariff are required to include "[t]he wholesale rates . . .

set at levels no greater than the provider's current retail rates less the provider's avoided costs."

therein expressed, when those intentions are clear from the face of the instrument.

The face of this Agreement is clear in its import.

Furthermore, the MPSC's decision violated the Act. Allowing MCI to take advantage of a tariff provision that was contrary to binding language in its Agreement constituted an inconsistent State regulation. If a party to an interconnection agreement is unilaterally allowed to rely upon more favorable tariff provisions, once agreed upon contract terms are no longer feasible from a business standpoint, the Act's scheme favoring negotiated contracts will be undermined.

Ameritech's Motion for Summary Judgment is **GRANTED**. The Court accordingly:

A. Declares that the MPSC ruling that the MCI may submit ·fax Change Orders to Ameritech under the general tariff, and that Ameritech must process those orders, violates the Telecommunications Act and federal and state common law;

B. Declares that MCI must submit Change Orders to Ameritech, if at all, via Ameritech's updated electronic interface, as provided in the Agreement;

C. Declares that Ameritech is under no obligation under the Agreement, tariff, or otherwise, to process Change Orders not submitted under the Agreement's electronic ordering provisions;

D. Enjoins MCI from sending Ameritech Change Orders via fax or any other method inconsistent with the Agreement; and

E. Enjoins the MPSC from enforcing its January 3, 2000 Order entered in Case No. U–12035.

**IT IS SO ORDERED.**