**MICHIGAN BELL TELEPHONE COMPANY, d/b/a/ Ameritech Michigan, Plaintiff,**

v.

**LEVEL 3 COMMUNICATIONS, LLC and Laura Chappelle, Robert B. Nelson and David Svanda, Commissioners of the Michigan Public Service Commission (In Their Official Capacities and not as Individuals), Defendants.**

No. 01–CV–70908.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 10, 2002.

Bruce R. Byrd, Ameritech Legal Department, Craig A. Anderson, Detroit, MI, Dennis G. Friedman, Pending App., Mayer, Brown, Chicago, IL, Michael G. Vartanian, John M. Dempsey, Dickinson Wright, Lansing, MI, for plaintiff.

William R. Ralls, Lansing, MI, Leland R. Rosier, Okemos, MI, David A. Voges, Steven D. Hughey, Michigan Department of Attorney General, Public Service Division, Lansing, MI, for defendants.

## OPINION AND ORDER

TARNOW, District Judge.

## I. INTRODUCTION [1]

This is an appeal by Plaintiff Michigan Bell Telephone Company, d/b/a Ameritech Michigan ("Ameritech") from an October

24, 2000 Order ("October Order") and a February 5, 2001 Order ("February Order") of the Michigan Public Service Commission ("MPSC") interpreting an interconnection agreement between Ameritech and Defendant Level 3 Communications ("Level 3"). Plaintiff Ameritech is suing both Level 3 and the individual commissioners of the MPSC, Laura Chappelle, David A. Svanda, and Robert B. Nelson ("Commissioners") seeking reversal of the MPSC's October and February Orders. Specifically, Ameritech is challenging five aspects of the MPSC Orders, which:

1) Allow Level 3 to treat calls to Internet Service Providers ("ISPs") as local exchange service for the purpose of meeting Federal Communications Commission ("FCC") requirements for converting special access service to enhanced extended loops ("EELs");

2) Allow Level 3 to purchase EELs from Ameritech without using Ameritech's certification form;

3) Deny Ameritech permission to collect termination charges when Level 3 chooses to convert special access services to EELs;

4) Require Ameritech to offer Level 3 unbundled network elements ("UNEs") in combination with tariffed services other than collocation services;

5) Require Ameritech to provide unbundled dedicated transport ("UDT") between Ameritech's facilities and those of a third party.

There were originally three motions pending before the Court: Plaintiff Ameritech's Motion for Summary Judgment [Docket # 15–1], Defendant Level 3's Cross–Motion for Summary Judgment [13–1 and 14–1],[2] and Defendant Commis-

---

1. Law Clerk Amy Harwell provided quality research assistance.

2. Defendant Level 3 filed a summary judgment motion on November 15, 2001 and another summary judgment motion on November 30, 2001. The motions appear to be

sioners' Motion to Dismiss. The Court held oral argument on all three motions on April 11, 2002. On April 24, 2002, the Court denied Commissioners' Motion to Dismiss, finding this Court has jurisdiction over the issues raised by Ameritech. This Opinion and Order addresses the two remaining summary judgment motions. For the reasons stated below, the Court DENIES IN PART Ameritech's Motion and GRANTS IN PART Level 3's Motion for Summary Judgment on issues one through four. However, the Court GRANTS IN PART Plaintiff's Motion, DENIES IN PART Defendants' motion, and REMANDS issue five, regarding the requirement that Ameritech provide UDT between Ameritech's facilities and those of a third party, to the MPSC for further proceedings.

## II. BACKGROUND

Local telephone service has traditionally been provided by state-regulated monopolies, who were each given a distinct operating area and were overseen by state public utility commissions. In 1996, Congress passed the Federal Telecommunications Act ("FTA") to deregulate the telephone industry. Plaintiff Ameritech is considered an incumbent local exchange carrier ("ILEC") because it was providing local exchange service prior to the effective date of the Federal Telecommunications Act of 1996. Other companies who are now trying to provide local exchange service are known as competitive local exchange carriers ("CLECs") or new entrants. Because the state public utility commissioners have extensive experience regulating local phone companies, the FTA gives the state commissions a role in the implementation of deregulation.

The FTA requires an ILEC to:

(1) permit requesting new entrants (competitors) in the ILEC's local market to interconnect with the ILEC's existing local network and, thereby, use that network to compete in providing local telephone service (interconnection); (2) provide its competitors with access to elements of the ILEC's own network on an unbundled basis (unbundled access); and (3) sell to its competitors, at wholesale rates, any telecommunications service that the ILEC provides to its customers at retail rates in order to allow the competing carriers to resell those services (resale).

*Iowa Utilities Bd. v. FCC,* 219 F.3d 744, 748 (8th Cir.2000) (citing 47 U.S.C. § 251(c)(2)-(4) (1994 ed., Supp. III)). Under the FTA, CLECs may request any or all of the above three options, and then the parties are permitted to voluntarily negotiate the terms of such agreement. 47 U.S.C. § 252(a)(1). If the parties cannot reach agreement, they may petition the state commission for arbitration of any unresolved issues. 47 U.S.C. § 252(b). Any final agreement, whether reached by voluntary negotiation or arbitration, must be approved by the state commission. 47 U.S.C. § 252(e)(1). If either party is "aggrieved by [the state commission's] determination, it may file an action 'in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.'" 47 U.S.C. § 252(e)(6).

In this case, the MPSC was asked to arbitrate an interconnection agreement between Level 3 and Ameritech, pursuant to 47 U.S.C. § 252(b), when the parties could not resolve several issues. An arbitration panel heard the parties' arguments, made a proposed decision ("DAP") on September

identical. Thus, while the motion has two docket numbers, the Court will consider them one motion for the purposes of this opinion and order.

27, 2000, and the parties filed exceptions. The MPSC issued an opinion adopting most of the panel's decision on October 24, 2000. The parties subsequently submitted an interconnection agreement consistent with the October Order, and the Commission approved it on February 5, 2001. Ameritech filed this lawsuit on March 7, 2001, seeking an injunction to prevent implementation of five aspects of the Commission's October and February Orders arguing they are contrary to federal law or arbitrary and capricious.

## III. STANDARD OF REVIEW

Under 47 U.S.C. § 252(e)(6), federal district courts may review state commission decisions regarding interconnection agreements. District courts review questions of federal law *de novo,* but state commission decisions on all other issues are entitled to deferential review, which asks whether the rulings were arbitrary and capricious. *Michigan Bell Tel. Co. v. MCI Metro Access Transmission Serv., Inc.,* 128 F.Supp.2d 1043, 1051 (E.D.Mich.2001). Another court in this district explained the arbitrary and capricious standard as follows:

The arbitrary and capricious standard requires that a district court give deference to the state commission's decisions; the agency's action will be presumed valid if a reasonable basis exists for its decision. [*U.S. West Communications, Inc. v. Hix,* 986 F.Supp. 13, 18 (D.Colo. 1997)]. This court should not "sit as a surrogate public utilities commission to second-guess the decisions made by the state agency to which Congress has committed primary responsibility for implementing the Act." *U.S. West Communications, Inc. v. Jennings,* 46 F.Supp.2d 1004, 1008 (D.Ariz.1999)....

Generally, an agency decision will be considered arbitrary and capricious if the agency had relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The Court is not empowered to substitute its judgment for that of the agency.

[*Hix,* 986 F.Supp. at 18].

*MCI Telecomm. Corp. v. Michigan Bell Tel. Co.,* 79 F.Supp.2d 768, 773 (E.D.Mich. 1999).

## IV. ANALYSIS

Ameritech objects to five aspects of the MPSC's Orders, which:

1) Allow Level 3 to treat calls to Internet Service Providers (ISPs) as local exchange service for the purpose of meeting FCC requirements for converting special access service to enhanced extended loops (EEL);

2) Allow Level 3 to purchase enhanced extended loops (EEL) from Ameritech without using Ameritech's certification form;

3) Deny Ameritech permission to collect termination charges when Level 3 chooses to convert special access services to enhanced extended loops (EEL);

4) Require Ameritech to offer Level 3 unbundled network elements (UNEs) in combination with tariffed services other than collocation services;

5) Require Ameritech to provide unbundled dedicated transport (UDT) between Ameritech's facilities and those of a third party.

The Court will examine each issue in detail below.

### 1. Allowing Level 3 to Count ISPs as Local Exchange Service to Meet FCC Requirements

The question is whether internet service provider ("ISP") traffic can be considered local under the FCC's "safe harbor" requirements. The practical effect of this question is monetary—whether the CLEC will pay the higher rate for special access circuits or whether the CLEC will be allowed to take advantage of a lower rate by using an enhanced extended loop ("EEL"), which is "a combination of two unbundled network elements ('UNEs'), the unbundled local loop and unbundled local transport" (P's Brief at 5).

According to the FCC, special access circuits may be converted to EELs only if they are used to provide "a significant amount of local exchange service." To show that one is providing "a significant amount of local exchange service," the CLEC must satisfy one of the three options found in the *Supplemental Order Clarification*[3] at ¶ 22(a)(b) and (c), known as the "safe harbor." The parties agree that since Level 3 only has ISP customers, they cannot meet the FCC's "safe harbor" requirements unless ISP traffic is considered local.

As an initial matter, it is clear that Level 3's ISP traffic can be considered local. In footnote 64 of the *Supplemental Order Clarification,* the FCC said that "[t]raffic is local if it is defined as such in a requesting carrier's state-approved local exchange

tariff and/or is subject to a reciprocal compensation arrangement between the requesting carrier and the incumbent LEC." The MPSC has found in several previous orders that ISP traffic is subject to a reciprocal compensation arrangement and is therefore local traffic. The MPSC ruled in favor of Level 3 stating that they have already considered and disposed of Ameritech's arguments on this issue several times in previous orders and have repeatedly concluded ISP is local.[4] The Court concludes that Level 3's ISP traffic can be considered local for determining whether Level 3 is providing a "significant amount of local exchange service."

However, this conclusion does not dispose of Ameritech's argument. Ameritech argues that while Level 3's traffic might be local, it must also be *voice* traffic to satisfy the FCC's safe harbor options. Ameritech contends that the MPSC's ruling conflicts with the FCC because the FCC consistently refers to "local voice traffic" not local data traffic in safe harbor options two and three.[5] Ameritech's argument is that the definition of "local traffic" in footnote 64 of the *Supplemental Order Clarification* does not define the term "local voice traffic" found in the safe harbor options. Ameritech asserts that since Level 3's service is local data traffic, it is not local voice traffic; thus, it cannot satisfy the FCC's safe harbor options.

In support, Ameritech cites footnote 76, which states "[w]ith regard to data ser-

3. *Supplemental Order Clarification, In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996,* 15 F.C.C.R. 9587, 2000 WL 713746 (June 2, 2000) ("*Supplemental Order Clarification*").

4. According to the MPSC, at least one of the orders was affirmed by the Western District of Michigan in *Michigan Bell Tel. Co. v. MFS Intelenet,* Docket # 5:98–CV–18, slip op. (W.D.Mich. Aug. 2, 1999).

5. Level 3 appears to concede that it cannot meet the first option of the safe harbor, which requires that the CLEC is the exclusive provider of local service. Level 3 does not offer its customers the ability to originate calls. Rather, they can only connect to Level 3 through another local service provider. Thus, the only question is whether Level 3 meets the requirements of either option two or three, which both include the phrase "local voice traffic."

vices, we note that the local usage options we adopt do not preclude a requesting carrier from providing data over circuits that it seeks to convert, as long as it meets the thresholds contained in the options." Ameritech concludes that "[b]y drawing this distinction, the FCC clearly recognized that 'data service'—such as service to ISPs—is *not* contained in the in the options that define a significant amount of local exchange service by referring to the amount of local voice traffic" (P's Brief at 9). Ameritech states that reading footnote 64 "to allow data services to be counted toward meeting those requirements negates the plain meaning of footnote 76" (P's Reply Brief at 4).

In response, Level 3 asserts several points. First, Level 3 states that footnote 76 is not relevant to this question because it involved a different context. The FCC was responding to one party's proposal that all data services should be eligible for conversion from special access circuits to EEL, and it simply rejected that argument as too broad. Second, Level 3 argues that in footnote 64 the FCC established a proxy for determining whether traffic is eligible for satisfying the "significant amount of local exchange service" test. Level 3 states that "[t]his rule appropriately includes ISP-bound traffic, but also excludes non-ISP-bound data traffic carried over special access circuits that would otherwise be subject to exchange access charges" (D's Resp. at 14). Third, due to internet phone calls, there is no way to determine whether ISP-bound traffic is data or voice.[6]

■ The Court rejects Ameritech's arguments regarding voice traffic and affirms the MPSC decision. First, Ameritech asserts that ISP service is data, not voice traffic, without citation. However,

internet phone calls are both voice traffic and ISP traffic. In addition, at oral argument, Level 3 postulated that the modifier "voice" is just another way to refer to "plain, old telephone service" or even a reference to the frequency or bandwidth where phone communications normally take place. Ameritech's argument seems to assume that Level 3's service only consists of data service. However, internet phone calling or reading the FCC's use of the word voice in the way Level 3 does demonstrates that Level 3 is providing voice traffic, and footnote 76 has little bearing on this issue. Finally, contrary to Ameritech's argument, footnote 76 does not negate footnote 64. The Court is persuaded by Level 3's arguments that footnote 76 was responding to an assertion in a different context. Consequently, the Court affirms the MPSC's decision on this point.

### 2. *Allowing Level 3 to Purchase eels Without Using Ameritech's Certification Form*

The MPSC found that Level 3 does not have to use Ameritech's certification form when seeking to convert existing special access arrangement to an unbundled loop and transport combination. Under the FCC's *Supplemental Order Clarification,* such a switch must be certified. The MPSC found that Level 3 may submit the certification information in a letter, and Ameritech seeks to reverse that decision and require the use of its own certification form.

Ameritech asserts that it uses the form to ensure compliance with the FCC's *Supplemental Order Clarification.* Ameritech argues that Level 3 presented no evidence that it would be more time consuming or significantly delay the conversion from

---

**6.** Level 3 also argues that the "ESP exemption" supports its argument. The Court declines to reach this argument due the resolu-

tion of the issue in Level 3's favor on other grounds.

special access, so it is not an undue burden on Level 3. Also, Ameritech has presented a chart that states exactly what the information is used for—in summary, it is used only to ensure compliance with the FCC's certification requirements (P's Brief at 12). Finally, Ameritech asserts that use of the form will prevent subsequent audits.[7] Ameritech concludes that the question is not whether it is an undue burden, whether it will slow processing, or whether it asks for information other than necessary to ensure compliance with the law, because none of those things are true here. Instead, Ameritech says the question is "whether Level 3 should be required to provide information it already has in order to give some indication that its certification is valid." (P's Brief at 11–13).

Level 3, on the other hand, argues that under the FCC's *Supplemental Order Clarification* "incumbent LECs must allow requesting carriers to self-certify" that they are meeting the FCC's requirements. ¶ 29. In addition, the FCC does not specify what form the certification should take, but instead, says "a letter ... is a practical method of certification." *Id.* The FCC further stated that an incumbent LEC may "not require a requesting carrier to submit to an audit prior to provisioning combinations of unbundled loop and transport network elements." *Id.* at ¶ 31. Before an incumbent LEC may conduct an audit, it must provide at least thirty days written notice and pay for an independent auditor. *Id.* Level 3 says that Ameritech's form amounts to an audit prior to switching, because the form asks for customer names, addresses, number of lines, and circuit numbers.

The Court affirms the MPSC's decision that Level 3 does not have to use Ameritech's certification form. The FCC could not be more clear in stating that CLECs are allowed to self-certify and that a letter is a practical format. In addition, Level 3 asserts the form is tantamount to a pre-switch audit. While Ameritech asserts some policy arguments trying to justify use of its form, they basically amount to statements that the form would be more convenient for Ameritech than a letter. Convenience to Ameritech is not a sufficient consideration to overcome the plain language found in the *Supplemental Order Clarification* that self-certification is allowed, a letter is appropriate, and pre-switch audits are not permitted. The MPSC's decision on this point is affirmed.

### 3. *Denying Ameritech Termination Charges When Level 3 Converts Special Access Services to EELs*

Ameritech wanted the MPSC to order Level 3 to pay "termination charges." Ameritech describes their proposal as, "when special access services are converted to loop—transport UNE combinations, Level 3 [should] be required to pay Ameritech Michigan 'termination charges' for the termination of the special access services" (P's Brief at 13). The FCC stated in its *UNE Remand Order*[8] that "any substitution of unbundled network elements for special access would require the requesting carrier to pay any appropriate termination penalties required under volume and term contracts." *UNE Remand Order* at ¶ 486, n. 985. Ameritech reads this Order as entitling them to termination charges.

7. The incumbent LEC is allowed to audit the CLEC "only to the extent reasonably necessary to determine a requesting carrier's compliance with the [FCC's] local usage options." *Supplemental Order Clarification* at ¶ 29.

8. *In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996*, Third Report and Order and Fourth Further Notice of Proposed Rulemaking, CC Docket No. 96–98, 15 F.C.C.R. 3696, 1999 WL 1008985 (Nov. 5, 1999) ("UNE Remand Order")

Level 3 counters that the penalties are not "appropriate," because the conversion caused no physical change in the underlying network configuration; the only difference was an administrative change in pricing. Level 3 states that "[i]n effect, since the carrier will continue to make use of the same circuit now provided as a UNE combination, there is no 'termination' of service in the true sense of the word and no incremental costs are incurred to effect the change." (Level 3's Brief at 16). Level 3 concludes that since Ameritech failed to show that there were any costs associated with the switch (and Ameritech cannot supplement the record now), no cost increases were "appropriate."

The MPSC agreed that the FCC allows "appropriate" termination penalties, but sided with Level 3 concluding that under state law, no termination penalties were appropriate in this situation. The MPSC pointed to another case, U–11525, where it did not find termination penalties were appropriate as authority for its decision here.

Ameritech has two responses to the MPSC's Orders and Level 3's argument. First, Ameritech asserts that U–11525 was decided before the *UNE Remand Order*, but it is not clear, nor does Ameritech argue, that appropriateness was not also the test before the *UNE Remand Order*. Second, and more important, Ameritech contends that the decision in U–11525 was a fact-specific finding that does not apply here. In U–11525, the MPSC found that Ameritech could obtain termination penalties provided for in the contract, but not if the termination was as a result of the customer's choice to go to a different local exchange service provider. Ameritech asserts that there is no choice of local exchange provider at issue here; thus, "the Commissioners have taken a narrow, fact-based holding and applied to entirely different facts" (P's Reply Brief at 6). Amer-

itech also asserts that U–11525 actually affirms the general rule that Ameritech can collect termination penalties. Ameritech concludes that federal law allows Ameritech to collect termination charges, and the MPSC's decision should be overturned on this point. As for Level 3's argument that Ameritech experienced no increase in cost, Ameritech disputes that statement and, in any event, argues it is irrelevant. Ameritech says that the MPSC did not rely on the lack of cost increases for its decision, and the Supreme Court has said that a court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quotation omitted), so it is irrelevant to this Court's decision whether the penalties are based on an increase in cost.

■ The Court affirms the decision of the MPSC on this point. Far from being a basis for the agency's action that the agency itself did not rely on, the MPSC specifically found that termination charges are not appropriate here. This Court reviews the Commission's application of federal law *de novo*, and the MPSC applied the correct federal legal standard which asks about "appropriateness." As for all other decisions, the Court applies the arbitrary and capricious standard. While the Court might decide the issue differently if reviewing it in the first instance, Ameritech has done nothing to demonstrate that the MPSC's decision was arbitrary and capricious. The Court affirms the MPSC's ruling on termination charges.

### 4. *Requiring Ameritech to Offer Level 3 UNEs in Combination with Tariffed Services*

Ameritech proposed incorporating the following language into the interconnection agreements' UNE appendix at 2.9.8:

Unbundled network elements may not be connected to or combined with [Ameritech's] access services or *other [Ameritech] tariffed service offerings* with the exception of tariffed Collocation Services where available.

(JA 0533). Level 3 objected to the underlined language, and the MPSC agreed with Level 3.

■ The parties agree that in the Supplemental Order, the FCC stated it was temporarily allowing ILECs to "constrain the use of combinations of unbundled loops and transport network elements as a substitute for special access services." *Supplemental Order* at ¶ 4. Thus, it is clear that without the underlined portion, section 2.9.8 is proper. The question before the Court regards the interplay between the FCC's Orders and 47 C.F.R. § 51.309(a) concerning the underlined portion. If the underlined portion were included, it would preclude Level 3 from combining UNE's with other tariffed offerings. The MPSC rejected the underlined phrase stating that the *Supplemental Order Clarification* only requires a prohibition on combining UNEs with special access, and nothing else. Consequently, in light of the broad language of FCC's rule 309,[9] no other limitation above what is specifically required should be imposed.

Ameritech argues that the underlined portion is consistent with federal law, and there is nothing that "affirmatively entitles" Level 3 to combine UNEs with tariffed services other than tariffed collocation services (P's Brief at 15). In support, Ameritech argues that the FCC stated "this option does not allow loop transport to be connected to the incumbent LECs tariffed services." *Supplemental Order*

*Clarification* at ¶ 22(a), (b), & (c). Ameritech says that such language makes its proposal consistent with federal law. In addition, Ameritech argues that the MPSC's reliance on Rule 309 is misplaced because it only discusses UNEs, not combinations of UNEs with tariffed services. Finally, Ameritech points to the Illinois Commerce Commission (ICC) recent decision in the Ameritech–Level 3 arbitration in Illinois, where the ICC agreed with Ameritech's position on this issue. The ICC found that when the FCC said "the co-mingling determinations that we make in this Order do not prejudge any final resolution on whether unbundled network elements may be combined with tariffed services," such language demonstrates that such combinations are not allowed at this time.

Level 3 responds, first, by stating that the FCC initiated a rulemaking to examine the statutory basis for "limiting an [ILEC's] obligation to provide combinations of loops and transport facilities as [UNEs] in light of the fact that it is not clear that the [FTA] permits any restrictions to be placed on the use of [UNEs]." *Supplemental Order* at ¶ 6. In the interim, the rule prohibiting these combinations is temporary to preserve the status quo until the FCC can examine it further. So while Level 3 admits that they are bound by the interim order, it argues that the order should not be allowed to extend any further because the FCC demonstrated skepticism that any restriction is permitted at all.

The Court affirms the MPSC's decision on this issue. As an initial matter, the Court notes that neither the MPSC nor

---

9. Rule 309 is found at 47 C.F.R. § 51.309(a) and states:

An incumbent LEC shall not impose limitations, restrictions, or requirements on requests for, or the use of, unbundled net-work elements that would impair the ability of a requesting telecommunications carrier to offer a telecommunications service in the manner the requesting carrier intends.

this Court is bound by the ICC's determination in the Illinois case. Thus, while the ICC's decision may be considered as persuasive authority, the MPSC is free to decide the issue differently, as long as the Commission follows federal law. Second, the Court agrees with the MPSC's interpretation of federal law regarding this issue. The MPSC stated that the Supplemental Order Clarification language relied upon by Ameritech "does not support a comprehensive ban on combining UNEs and tariffed services" (October Order at 26). In fact, the FCC specifically characterized the temporary prohibition as proscribing only the "combining loops or loop-transport combinations with tariffed special access services" and stated the reason for the temporary ban is to keep CLECs from using UNEs "solely or primarily to bypass special access services." *Supplemental Order Clarification* at ¶ 28. In light of the broad language of Rule 309 and the careful use of "special access services" in the Supplemental Order Clarification, the Court agrees with the MPSC that the temporary prohibition should be construed as narrowly as possible. Thus, the Court affirms the MPSC's decision on this issue.

### 5. *Requiring Ameritech to Provide UDT Between Ameritech's and a Third Party's Facilities*

The underlying dispute is whether Ameritech must provide unbundled dedicated transport (UDT) to a third-party's location where Level 3 has a presence, or whether they should only have to provide when the location is "owned by" the requesting carrier, in this case, Level 3. New rule 319(d)(1) states that ILECs must provide UDT to "any requesting telecommunications carrier." Dedicated transport is defined as:

> incumbent LEC transmission facilities, including all technically feasible capacity-related services including, but not limited to, DS1, DS and OCn levels, dedicated to a particular customer or carrier, that provide telecommunications between wire centers owned by incumbent LECs or requesting telecommunications carriers, or between switches owned by incumbent LECs or requesting telecommunications carriers.

47 C.F.R. § 51.319(d)(1)(i). Ameritech says that "owned by" does not contemplate third parties. Level 3 and the MPSC take a broader view of "owned by," stating that a presence is all that is required. They argue that Ameritech's reading would require a specific inquiry into the particulars of what is meant by ownership, *e.g.*, must it be in fee simple, is a lease sufficient, is there a certain percentage of ownership required?

The MPSC admits they quoted a superceded portion of the CFR. They argue that their determination would come out the same way under the new § 319(d)(1) and then cites two other bases for its decision: 1) the arbitration panel's reliance on § 319(d)(2) and 2) the Texas Public Utility Commission recently ruled the same way. Ameritech counters that this Court cannot rely upon a basis for a decision not relied upon by the MPSC, and they did not rely upon either of the bases supplies in the briefs. They assert that "[i]t is not the role of the reviewing court to cure deficiencies in the agency's decision," citing *Motor Vehicle*, 463 U.S. at 43, 103 S.Ct. 2856.

■ After reviewing the MPSC's decision, it is clear they relied on the superceded regulation. It is possible the new regulation would change the result. For example, the MPSC asserts as part of its rationale that the dedicated transport may be to third parties because the regulation placed carrier and customer in the plural form. However, under the new regulation, carrier and customer are not in the plural

form. It is not clear to the Court what effect this difference would have on the MPSC's decision. While, the MPSC asserts that it would rule the same way under the new § 319, the Court may only rely on the reasoning in the record and may not supply a basis for the decision on which the MPSC itself did not rely. *MCI Telecomm.*, 79 F.Supp.2d at 773 ("a court must examine the Commission's decision and the record underlying the decisions" and "a court can uphold the state commission's decision only on the grounds set forth in the decision."). Therefore, the Court remands this issue MPSC to determine what effect, if any, the new regulation has on the parties' arguments.

## V. CONCLUSION

On the parties' Cross–Motions for Summary Judgment, the Court AFFIRMS the MPSC's decision to: (1) count ISP traffic as local traffic for the purposes of the FCC's safe harbor provisions, (2) not require Level 3 to use Ameritech's certification form, (3) deny Ameritech termination charges, and (4) permit Level 3 to combine UNEs with tariffed services other than special access. However, the Court REMANDS the fifth issue, regarding whether Ameritech has to provide UDT to third parties, to the MPSC for a determination of what effect the new § 319 has on their ruling. Therefore, Defendant's Motion for Summary Judgment [13–1 and 14–1] is GRANTED IN PART as to issues one through four and DENIED IN PART as to issue five, and Plaintiff's Motion for Summary Judgment [15–1] is GRANTED IN PART as to issue five and DENIED IN PART as to issues one through four. A judgment will be entered accordingly.